[S. F. No. 22270.   In Bank.   Aug. 21, 1968.]

UNITED STATES LEASING CORPORATION, Plaintiff and Respondent, v. MICHAEL H. DuPONT et al., Defendants and Appellants.

Hill, Farrer & Burrill, Stanley E. Tobin, Jack R. White and Rex W. Kellough for Defendants and Appellants.

John D. Glynn as Amicus Curiae on behalf of Defendants and Appellants.

John H. Wallace for Plaintiff and Respondent.

SULLIVAN, Acting C. J.—Defendants appeal from a judgment entered in an action for declaratory relief brought to establish and enforce their liability under a written guaranty executed in connection with a lease of certain restaurant and kitchen equipment by plaintiff United States Leasing Corporation (USLC) to Cal-West Aviation, Inc. (Cal-West).

Plaintiff USLC is a corporation engaged in the business of purchasing personal property and leasing such property to others, maintaining no inventories of equipment other than property it has repossessed upon breaches of such leases. Cal-West is a corporation which embarked on a business venture to operate a ferryboat restaurant to be known as "Harper's Ferry," at San Carlos, California. Cal-West, through its president Howard S. Harper, negotiated with USLC for the lease of the required restaurant and kitchen equipment. Defendants are Michael H. duPont, a friend of Harper, and duPont's wife.

The case consists almost entirely of documentary evidence. On February 23, 1961, at its San Francisco office USLC executed and delivered to Cal-West a so-called "lease commitment letter" which Harper then and there acknowledged in writing as "accepted" by Cal-West. The letter provided generally that a commitment to cover a lease by Cal-West of restaurant and kitchen equipment had been approved by the credit committee of USLC in the amount of $100,000 at specified terms with periodic payments over an *eight-year* period "and a deposit of $10,510.00." The letter further provided that the commitment would be effective until April 15, 1961, and that the equipment covered must be delivered, accepted and placed on a lease schedule by that date. It was also stated that the commitment was subject to several conditions, among others:[1] (1) a continuing guaranty from defendants; (2) an agreement by defendants to pledge acceptable and marketable securities in the amount of USLC's exposure on its demand; and (3) submission of personal statements by defendants quarterly. Finally, the letter set forth the procedure for the execution of enclosed forms designed to carry out the agreement and put the lease into effect and described the purchase

---

[1]The circumstances relating to the satisfaction of another condition, the receipt by USLC of a chattel mortgage on the ferryboat, although a subject of dispute at trial, is irrelevant to the contentions raised herein and will not be discussed. A fifth condition related to changes in Cal-West's and defendants' financial condition (see fn. 7, *infra*).

order and invoice procedures for the acquisition of the equipment.[2]

Concurrently with Harper's acceptance of the lease commitment letter, USLC and Cal-West executed a document provided by USLC entitled "Lease" which was also under date of February 23, 1961. The lease provided in part as follows: "Lessor hereby leases to lessee, and lessee hereby leases and hires from lessor, all machinery, equipment and other property described in (a) the schedule executed by the parties concurrently herewith or hereafter and made a part hereof, and (b) any schedule or schedules hereafter executed by the parties hereto and made a part hereof." It contained, inter alia, detailed provisions relating to use, inspection, repairs and loss and damage of the equipment; surrender, insurance and taxes; security, default and bankruptcy; lessor's remedies and right of reimbursement; interest and integration, some of which will be set forth in detail *infra*. None of the afore-mentioned schedules were either contained in, attached to or made a part of the lease.

Later that same day in Los Angeles, defendants were shown the lease commitment letter and the lease by Harper and they executed a "Guaranty" form and a document entitled "Supplementary Agreement" (carrying out condition (2) and agreeing to perform condition (3) in the letter, see text at fn. 1, *ante*), both forms also having been provided by USLC. The guaranty provides inter alia that defendants guarantee and promise, "on demand (1) to pay [USLC] . . . all rents and all other sums reserved in that certain lease, including all schedules now or at any time hereafter made a part thereof. . . . dated February 23, 1961, . . . in the amounts, at the times and in the manner set forth in the Lease, and (2) to

---

[2]The letter specifically provided as follows: "PURCHASE ORDER PROCEDURE When the required documents, properly executed, have been returned, you may then issue your order to the vendor, sending a copy of the order to this office. Your order should include the following: 'This order is placed subject to your receipt of a confirming purchase order from United States Leasing Corporation. Please bill United States Leasing Corporation in quadruplicate and show consignee.' We will then, in turn, issue our confirming purchase order to the vendor and send a copy of same to you for your records.

"INVOICE PROCEDURE Upon receipt of the invoice from the vendor, we will send same to you for your approval and acceptance. Upon return of the accepted and approved invoice we will then issue a payment schedule based on the figures contained in the Lease Payment Proposal. [See fn. 13, *infra*.] Upon your acceptance of this schedule we will then remit payment to the vendor for the equipment."

perform, at the time and in the manner set forth in the Lease, all of the terms, covenants and conditions therein required to be kept, observed or performed by the Lessee,'' and that their liability shall not exceed at any one time the total sum of $135,120.[3]

As specified in the purchase order procedure set forth in the lease commitment letter (see fn. 2, *ante*), USLC received a copy of Cal-West's purchase order for $150,000[4] dated February 23, executed by a construction company as agent for Cal-West, and issued its own confirming purchase order, undertaking to pay the supplier named in Cal-West's order only upon USLC's receiving title to the equipment designated therein, and upon Cal-West's receipt and acceptance of the equipment, approval of the supplier's invoice therefor, and instructions to USLC to pay the invoice.[5] Notwithstanding the foregoing provisions relating to the time of payment, on March 7, at the request of Cal-West, USLC made a progress

[3] The provision relating to the limitation of defendants' liability reads more fully: ''2. The liability of the undersigned Guarantors hereunder shall not exceed at any one time the total sum of $135,120.00. Notwithstanding the foregoing limitation, Lessor may permit the total amount of Lessee's indebtedness and obligations to Lessor to exceed the Guarantors' aforesaid maximum liability hereunder.'' The guaranty further provides: ''4. Guarantors authorize Lessor, without notice or demand, and without affecting their liability hereunder, from time to time to: (a) change the amount, time or manner of payment of rent or other sums reserved in the Lease; (b) change any of the terms, covenants, conditions or provisions of the Lease; (c) amend, modify, change or supplement the Lease; (d) assign the Lease or the rents and other sums payable thereunder; (c) consent to the Lessee's assignment of the Lease or to the sublease of all, or any portion, of the property covered by the lease; (f) take and hold security for the payment of this guaranty or the performance of the Lease, and exchange, enforce, waive and release any such security; (g) apply such security and direct the order or manner of sale thereof as Lessor in its discretion may determine; and (h) release or substitute any one or more of the Guarantors. Lessor may without notice assign this guaranty in whole or in part. Guarantors shall not assign this guaranty without the prior written consent of Lessor.''

[4] The purchase order included ''all taxes, delivery and installation'' of the restaurant and kitchen equipment. The discrepancy between the $100,000 sum stated in the lease commitment letter and this $150,000 purchase order was, according to plaintiff's counsel at trial, the result of an internal error by USLC; the commitment ''should have been'' for the larger sum. This discrepancy is the subject of one of the defendants' defenses. (See *infra*.)

[5] Although under the terms of USLC's confirming purchase order the supplier was not to be paid by USLC until the foregoing conditions were satisfied, the lease provided that the lease term commenced upon the date USLC confirmed Cal-West's purchase order or the date when the equipment was delivered to Cal-West, whichever was earlier. Nevertheless, there having been no schedules attached to the lease form, as yet there was nothing leased and no rent provided for.

payment in the sum of $50,000 to the supplier. Upon payment of the $50,000, USLC secured from Cal-West "Schedule No. 1" to the lease, calling for a total "rent" of $51,500 over a period of *three months*. However under the heading "Equipment leased" on the form, evidently designed to be used in conjunction with the lease form, appeared the following: "Advance Payment to be used for progress payments to vendor." The secretary and counsel of USLC testified that this schedule was executed in order to secure some evidence of the immediate indebtedness of Cal-West and to provide for additional compensation to USLC for the use of its money advanced prior to the time contemplated in the lease commitment letter. No copy of this document was furnished to defendants. Cal-West paid USLC $500 immediately due under the schedule.

On March 9 USLC advised Harper by letter that an additional commitment to Cal-West in the amount of $50,000 has been approved based on the same rate, terms and conditions as in the February 23 lease commitment letter. (See fn. 4 *ante*.) This letter was returned "accepted" by Harper for Cal-West on March 27. No copy of this document was furnished to defendants.

By letter dated March 20, and returned accepted on April 19, the commitment (represented by the letters of February 23 and March 9) was extended from April 15 until June 15, 1961. No copy of the letter of extension was furnished to defendants.

On April 5, "Schedule No. 2" was executed, purportedly for the same reasons as Schedule No. 1 had been. It was substantially identical with Schedule No. 1 except that a "rent" of $102,000 was called for in one payment due in *two months*. No copy of Schedule No. 2 was furnished to defendants. No cash was immediately advanced by USLC but a letter of credit for $100,000 was issued to the supplier by USLC's bank. No draft was ever written against it.[6] As of April 5, the supplier had not yet acquired and shipped to Cal-West the equipment covered in the purchase orders; therefore, according to the conditions set forth in USLC's purchase order,

[6]The supplier's invoices, which Harper approved and authorized USLC to pay on May 31, were submitted to USLC's bank by the supplier in order to draw against the letter of credit, but these invoices were returned on June 12 because they failed to reflect the earlier $50,000 progress payment. On June 20 the supplier submitted a new invoice, showing the $50,000 credit, which Harper approved and authorized USLC to pay. (See *infra*.)

USLC had not yet become obligated to pay the supplier's invoice. However, about $100,000 worth of equipment was described in the supplier's invoices dated April 20. On May 15, Cal-West's contractor received and approved these invoices. On May 31, Harper executed and delivered to USLC a statement of his receipt and acceptance of the equipment, his approval of each invoice and his request that USLC pay the supplier.

Sometime in late May defendants' attorney orally notified USLC that Cal-West was having financial difficulty, and urged termination of the transaction.[7] USLC in turn orally requested defendants to put up some collateral or cash.[8] Defendants delivered to USLC a written "Notice of Revocation of Continuing Guaranty and Notice to Proceed Against Principal" dated May 22, 1961.

On June 6 Cal-West was in default under Schedule No. 2 and on June 9 it was in default under Schedule No. 1, for an amount in the aggregate of $153,000. On June 9 Cal-West filed a petition for an arrangement under chapter XI of the Bankruptcy Act. Only the $500, which had been paid when Schedule No. 1 was executed, had been received by USLC.

On June 16 USLC demanded of defendants in writing the sum of $51,000 "rent" claimed by it to be past due under the lease (i.e., under Schedule No. 1). The demand also stated that upon USLC's payment of an additional $100,000 to the supplier, Cal-West and consequently defendants would become obligated under the lease (i.e., under Schedule No. 2) for such additional amount, and demanded of them a financial statement and a deposit of $100,000 collateral. (See fns. 8, *ante*, 20, *infra*.)

On June 20, Cal-West, now a debtor in possession (see Bankruptcy Act, 11 U.S.C.A., § 742), approved the supplier's invoice for a total of $136,429.96, "Less Advance Payment" of $50,000, or for a balance of $86,429.96 then due the sup-

---

[7]It is not clear from the record whether defendants claimed that termination by USLC was justified under a condition contained in the lease commitment letter that "there be no material adverse change in the financial condition of lessee or of the Guarantors prior to the culmination of this transaction," as well as under the bankruptcy provisions in the lease (see text at fn. 16 *infra*).

[8]The supplementary agreement executed by defendants (see *ante*) provided inter alia: "If, in the opinion of USLC, the security for the performance of the obligations of Cal-West Aviation, Inc. or Guarantors to USLC shall be inadequate, Guarantors will, within 10 days after receipt of *written* notice from USLC to such effect, deposit with USLC or subject to its control, collateral in the form and in the amounts as shall be satisfactory to USLC." (Italics added.)

plier from USLC (see fn. 6, *ante*) and requested USLC to pay the supplier such amount. About the same date USLC padlocked certain of Cal-West's aircraft hangars where it had been storing the equipment pending installation in the restaurant.

On February 28, 1962, USLC filed an "Application for Reclamation of Personal Property and Creditor's Claim" in the bankruptcy proceedings, which had been transferred into a proceeding for reorganization under chapter X of the Bankruptcy Act. By such application USLC sought surrender of the subject equipment by the trustees of the estate of Cal-West and allowance of USLC's unliquidated creditor's claim for breach of the lease commitment agreement and the lease. In response the trustee in bankruptcy, alleging that USLC had converted to its own use the personal property and the aircraft hangars belonging to Cal-West, filed a counterclaim for the reasonable value of the equipment in the hangars and the reasonable value of the use of the hangars allegedly converted.

The supplier's claim for payment eventually was settled for $81,322.87 by USLC and on April 30, 1962, USLC filed the instant action for declaratory relief. USLC contended inter alia that defendants were obligated under their guaranty to pay it the rental provided for in the lease commitment agreement and the amendments thereto or the rentals set forth in the schedules up to the sum of $135,120 plus interest and under the supplementary agreement to deposit collateral as required therein. Defendants denied liability on their guaranty, first claiming that they had guaranteed Cal-West's performance under a lease which had not come into existence and later focusing their attention on the effect of Cal-West's execution of the schedules on their guaranty. USLC's above-mentioned application filed in the bankruptcy proceedings and the trustee's counterclaim were taken off calendar "to allow [USLC's] declaratory relief action against Michael DuPont [*sic*] to progress to trial." Although those matters are still pending, the restaurant equipment was sold by the trustee on May 10, 1963, and the proceeds of the sale are being held subject to further order of court.

The trial court found inter alia: that defendants guaranteed USLC against "economic loss" arising out of its performance under the lease commitment letter and the lease up to a limit of $135,120; that USLC issued its confirming purchase order in consideration of and in reliance on the guaranty; that upon such event defendants' guaranty became

irrevocable "as to any liabilities thereby incurred by USLC" up to the limit of $135,120; that there was no material alteration of the obligations of Cal-West to USLC by the execution of the schedules; that prior to its receipt of defendants' notice of revocation of continuing guaranty and to proceed against the principal, USLC was obligated for the cost of the equipment; that Cal-West's approval of the supplier's invoice was received by USLC prior to Cal-West's petition in bankruptcy; that no final schedule to the lease was executed only because of the intervening bankruptcy of Cal-West; and that USLC demanded in writing that defendants abide by their guaranty and supplementary agreement, but defendants have refused to do either.

The court concluded that defendants were obligated to USLC on the guaranty for sums disbursed by USLC to purchase the restaurant and kitchen equipment together with interest, reasonable attorney fees and various other costs and expenses incurred by USLC. Judgment was entered accordingly.[9]

Defendants contend: (1) that the two schedules adopted as part of the lease materially altered the principal contract without defendants' consent and thereby exonerated them from any liability under their guaranty, notwithstanding the anticipatory consent clause in paragraph 4 in the guaranty form (see fn. 3, *ante*); (2) that at the time defendants executed the guaranty, there existed a prior undisclosed agreement between USLC and Cal-West to increase the amount of the lease commitment by 50 percent over the amount represented in the various documents presented to defendants and that USLC's failure to inform defendants thereof constituted constructive fraud rendering the guaranty void; (3) that the failure of USLC to require the deposit from Cal-West as set forth in the agreement exonerated, and the misrepresentation in the lease that the deposit had been received discharged, defendants from liability under the guaranty; (4) that even assuming they were not exonerated from liability under the

---

[9]The judgment provides that under the guaranty dated February 23, 1961, defendants are jointly and severally obligated to pay plaintiff $131,322.87 with interest; $13,646.49 as reimbursement for sums expended for the protection and preservation of the equipment and as attorney fees and costs in Cal-West's bankruptcy proceedings; and $14,180.61 as attorney fees in the instant action. It is further ordered therein that any funds received by USLC in the bankruptcy proceedings shall be credited against the amounts owing from defendants; and that defendants shall deposit with plaintiff cash, readily marketable securities or other satisfactory collateral of a value not less than $150,000.

guaranty, defendants incurred no liability thereunder since they guaranteed Cal-West's performance under the lease and Cal-West incurred no liability under the lease; and (5) that the award of damages and interest was contrary to law. We have concluded that defendants' fourth contention is meritorious and that they have no liability to USLC under their guaranty. We therefore need not and do not reach the other contentions advanced by defendants.

Before setting forth what we have concluded to be defendants' enforceable obligations under the guaranty, we make some preliminary observations. ■ ''[W]hile a surety[10] cannot be held beyond the express terms of his contract, the contract is to be interpreted by the same rules used in construing other types of contracts, with a view towards effectuating the purposes for which the contract was designed. [Citations.]'' (*Bloom* v. *Bender* (1957) 48 Cal.2d 793, 803 [313 P.2d 568]; Civ. Code, § 2837; see *Everts* v. *Matteson* (1942) 21 Cal.2d 437, 449 [132 P.2d 476]; *Ryan* v. *Shannahan* (1930) 209 Cal. 98, 101-102 [285 P. 1045]; *Sather Banking Co.* v. *Arthur R. Briggs Co.* (1903) 138 Cal. 724, 730 [72 P. 352]; 46 Cal.Jur.2d, Suretyship & Guaranty, § 27, p. 231, and fn. 20; 38 C.J.S., Guaranty, § 38, p. 1177.) ''Extrinsic evidence is 'admissible to interpret the instrument, but not to give it a meaning to which it is not reasonably susceptible' [citations], and it is the instrument itself that must be given effect. [Citations.]'' (*Parsons* v. *Bristol Dev. Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839]; see *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co., ante,* p. 33, at p. 37 [69 Cal.Rptr. 561, 442 P.2d 641].) ■ Additionally, it is ''solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence. Accordingly, 'An appellate court is not bound by a construction of the contract based solely upon the terms of the written instrument without the aid of evidence [citations], where there is no conflict in the evidence [citations], or a determination has been made upon incompetent evidence [citation].' (*Estate of Platt,* 21 Cal.2d 343, 352 [131 P.2d 825].)'' (*Parsons* v. *Bristol Dev. Co., supra,* 62 Cal.2d 861, 865.)

We now set forth what we have concluded to be defendants' obligations under the guaranty based upon our inde-

---

[10]The 1939 amendment to Civil Code section 2787 abolished the distinction between sureties and guarantors and specifically subjected contracts of guaranty to all provisions of the law relating to suretyships. (*Bloom* v. *Bender* (1957) 48 Cal.2d 793, 797-798 [313 P.2d 568].)

pendent determination as to the meaning of the terms thereof and upon the uncontradicted extrinsic evidence. The obligation expressly assumed by defendants under the terms of the guaranty was "on demand (1) to pay . . . all rents and all other sums reserved *in that certain lease,* including all schedules now. or at any time hereafter made a part thereof, . . . dated February 23, 1961, . . . and (2) to perform . . . all of the terms, covenants and conditions *therein required* to be kept, observed or performed by the Lessee." (Italics added.) The guaranty also contained provisions permitting USLC and Cal-West to increase the amount of Cal-West's indebtedness above defendants' maximum liability and consenting to changes, modifications, supplements and alterations of the terms of the lease without affecting defendants' liability thereunder (see fn. 3, *ante*). This guaranty form was fur-.nished by USLC for defendants' signatures in order to satisfy a condition of the commitment that USLC be supplied with a "continuing Guaranty." The guaranty makes no reference to any rents, sums, terms, covenants or conditions other than those set forth in the lease form. ▉ Nevertheless, "we must, in order to ascertain the nature and extent of the liability to which the sureties have bound themselves, examine the undertaking by the light of the agreement of whose terms it guarantees the faithful performance." (*Ryan* v. *Shannahan, supra,* 209 Cal. 98, 102; see pp. 103, 104; citing cases; *Kurtz* v. *Forquer* (1892) 94 Cal. 91, 94 [29 P. 413]; *Somers* v. *United States Fid. & Guar. Co.* (1923) 191 Cal. 542, 545-546 [217 P. 746]; *Roberts* v. *Security Trust & Sav. Bank* (1925) 196 Cal. 557, 563, 566-567 [238 P. 673]; *Davenport* v. *Stratton* (1944) 24 Cal.2d 232, 244-245 [149 P.2d 4].)

When the lease was executed on February 23, 1961, by USLC and Cal-West it was completely devoid of subject matter. As we have already pointed out, the leased property was to be described in a "schedule executed by the parties concurrently herewith or hereafter and made a part hereof." No schedule of any kind was executed concurrently with the lease. Accordingly to make the lease practically operable, it was necessary for schedules to be subsequently executed and made a part of the lease, setting forth a description of "all machinery; equipment and other property" (par. 1 of lease); —the date on which the "term of this lease ends" (par. 2 of lease); and the "rent for any and every item of equipment described in the schedule" (par. 3 of lease). The parties appear to be in agreement that the principal obligation

guaranteed must be ascertained from reading both the lease form and the lease commitment letter, both of which were presented to defendants at the time they executed their guaranty. Reading the lease commitment letter in conjunction with the lease in order to ascertain with particularity the nature and extent of the obligation that defendants guaranteed, we see that the parties intended ultimately, by means of schedules to be made a part of the lease, to provide for the lease of restaurant and kitchen equipment in the amount of $100,000 ''based on an 8-year term with 60 monthly payments of $2,102.00 each followed by 3 annual payments of $3,000.00, and a deposit of $10,510.00. Renewals after this basic lease period would then be $3,000.00 per year.''

It was the position of USLC in the trial court that defendants had guaranteed the *entire transaction* entered into by Cal-West as disclosed by the documents and the ''surrounding circumstances'' including the obligation reflected by the lease commitment letter as well as that imposed by the lease itself. The evidence of ''surrounding circumstances'' consisted of the following: (1) that USLC pursuant to the provisions of the lease commitment letter would not, and accordingly did not, order the equipment to be leased until it had received from Cal-West the ''required documents,'' including the continuing guaranty and the supplementary agreement signed by defendants; (2) that the lease term commenced as soon as the equipment was identified by Cal-West's purchase order and USLC's confirming purchase order; and (3) that the economic risk against which USLC claimed it was protected by the guaranty, commenced when USLC submitted its confirming purchase order.

We must now turn to examine the crucial determination made by the court below as to the legal effect of the guaranty signed by defendants. The trial court ''found'' in essence that defendants had agreed to guarantee USLC against ''economic loss'' and that therefore such guaranty covered not merely Cal-West's obligations under the lease but also its obligations under the lease commitment letter.[11] From our independent examination of the pertinent documents and the uncontradicted evidence (*Parsons* v. *Bristol Dev. Co.,* *supra,* 62 Cal.2d 861, 865-866), we have no difficulty in con-

---

[11]Finding 6 states: ''By executing said Guaranty, defendants intended and agreed to guaranty USLC against economic loss arising out of its performance of the matters set forth in [the lease commitment letter and the lease form] (including amendments, modifications, changes and supplements thereto) up to the limit of $135,120 set forth in the Guaranty.''

cluding that defendants did not in any way guarantee USLC against "economic loss." It is clear that they guaranteed only Cal-West's performance of the lease, with a specified limit of liability, subject however to USLC's reserved right to amend the lease. Nothing found in the pertinent documents imposes upon defendants either a blanket liability for "economic loss" sustained by USLC or any liability to indemnify or reimburse USLC for the purchase price paid by it for the equipment involved. To put it another way, defendants guaranteed the periodic payments of rent under the lease and the performance of the terms, covenants and conditions pertaining to the leasing of the property; they did not guarantee the repayment to USLC of amounts expended by the latter in acquiring the property to be leased.

The fact that the guaranty was included as a condition of the lease commitment and the fact that the term of the lease commenced upon USLC's issuance of its confirming purchase order do not compel the conclusion that defendants undertook to guarantee Cal-West's obligations under the lease commitment agreement as well as the lease.[12] Additionally, the confirming purchase order provided as a condition precedent to USLC's obligation to pay the supplier that the equipment be first received and accepted by Cal-West, which would then approve the supplier's invoice therefor and instruct USLC to make the payment. Accordingly there is no basis in fact for USLC's contention that the risk of economic loss, claimed to be covered by defendants' guaranty, commenced when the confirming purchase order issued. The invoice procedure set forth in the lease commitment letter makes clear that any so-called economic risk of USLC was intended to arise only when the rental had been designated. The invoice procedure provided that upon Cal-West's "return of the accepted and

---

[12] The lease commitment letter was "accepted" by Cal-West in acknowledgment that "all of the above is in accordance with your agreement with the United States Leasing Corporation." Nevertheless, "the above" was a commitment on the part of USLC to lease the subject equipment as therein provided. The letter contained no provisions expressly obligating Cal-West to perform under the purchase order and invoice procedures.

Moreover, the lease commitment letter nowhere provided that Cal-West would be liable for any "economic loss" suffered by USLC in performing under the lease commitment letter, assuming Cal-West was obligated to perform thereunder. Its liability thereunder, if any, would appear to be for breach of an agreement to put the lease into effect as provided therein, with damages being determined by the lease rather than by USLC's purchase price for the subject equipment. (See generally 54 A.L.R. 1355, 1359.)

approved invoice,'' USLC would then issue a payment schedule based on the figures contained in the ''Lease Payment Proposal''[13] and upon Cal-West's acceptance of this schedule would pay the vendor for the equipment (see fn. 2, *ante*),. In sum, the record does not support the trial court's determination that defendants guaranteed USLC against all economic loss in the entire transation.

The trial court also found in substance (a) that the equipment covered by Cal-West's purchase order dated February 23, 1961, was the equipment referred to in the lease commitment letter of even date and (b) upon USLC's issuance of a confirming purchase order therefor, the guaranty of defendants became irrevocable as to any liabilities thereby incurred up to the limit specified.[14] The lease referred to in the lease commitment letter was one ''in the amount of $100,000.00,'' but Cal-West's purchase order was in the amount of $150,000. Therefore, when USLC issued its confirming purchase order in the larger amount, it obligated itself, subject to the conditions set forth therein, to pay the supplier for $50,000 of equipment not mentioned in the lease commitment letter. The trial court made a finding on this point, stating that by Cal-West's acceptance of USLC's letter dated March 9, both parties intended to ''memorialize in writing a prior oral agreement that USLC would purchase equipment up to a total cost of $150,000 instead of $100,000 as provided for in [the lease commitment letter]. . . . Said oral agreement was expressed in the purchase order of USLC wherein USLC agreed to pay.

---

[13]This document was marked for identification but denied admission into evidence on defendants' objection. At the trial USLC attempted to introduce in evidence the lease commitment letter, the ''Lease Payment Proposal'' and Cal-West's purchase order on the theory that the entire transaction set forth in the lease commitment letter and the lease was guaranteed by defendants. Defendants objected to the introduction of the documents on the basis that defendants only guaranteed Cal-West's performance under the lease and the documents were being offered to vary the terms thereof contrary to the parol evidence rule. The trial court admitted the lease commitment letter into evidence in order to explain the lease agreement between Cal-West and USLC, rejected the lease payment, proposal, and admitted the purchase order for the limited purpose of proving that USLC proceeded to purchase some property which USLC contended was done in order to fulfill the terms of the lease.

[14]Finding 7 states: ''On February 23, 1961, Cal-West, acting by and through its agent thereunto duly authorized, executed its purchase order for the restaurant and kitchen equipment referred to in [the lease commitment letter].''

Finding 13 states: ''Upon issuance of USLC's purchase order and the acceptance thereof, the Guaranty of defendants became irrevocable as to *any liabilities thereby incurred* by USLC up to the limit of $135,120.00 set forth in the guaranty.'' (Italics added.)

up to $150,000 for the equipment ordered from the vendor." We already have concluded that defendants did not obligate themselves to guarantee "any liabilities" incurred by USLC, but rather to guarantee only Cal-West's performance under the lease. At the time the guaranty was executed, the lease contemplated was one for equipment in the sum of $100,000. We therefore construe the guaranty as covering only Cal-West's performance under a lease of $100,000 worth of equipment.

Since a surety cannot be held beyond the express terms of his contract (see *Bloom* v. *Bender, supra,* 48 Cal.2d 793, 803; *Ryan* v. *Shannahan, supra,* 209 Cal. 98, 101-102; *Garfield* v. *Ford* (1923) 191 Cal. 69, 71 [214 P. 963] (guaranty); *County of San Luis Obispo* v. *Ryal* (1917) 175 Cal. 34, 35-37 [165 P. 1]; *Nickals* v. *Stanley* (1905) 146 Cal. 724, 725 [81 P. 117] (administrator's bond); *Curtin* v. *Harvey* (1898) 120 Cal. 620, 621-622 [52 P. 1077] (attachment bond); *City of Healdsburg* v. *Mulligan* (1896) 113 Cal. 205 [45 P. 337, 33 L.R.A. 461] (official bond); *Tarpey* v. *Shillenberger* (1858) 10 Cal. 390, 391 (injunction bond); 38 C.J.S. Guaranty, §§ 43, 50, pp. 1191, 1203), the parties to the principal contract in the case at bench could not increase defendant's obligations under their guaranty by increasing the amount of equipment covered by the lease after the guaranty had already been executed unless the guaranty made provision therefor. (See, e.g., *Anglo-Californian Bank* v. *Cerf* (1905) 147 Cal. 393, 399 [81 P. 1081]; *Sather Banking Co.* v. *Arthur R. Briggs Co., supra,* 138 Cal. 724, 731-734 (mortgage for continuing liability).) The guaranty provision permitting USLC to increase the amount of Cal-West's indebtedness above defendants' maximum liability (see fn. 3, *ante*) did not further provide that such increases would be encompassed within the guaranty. We interpret that provision as merely permitting USLC to increase Cal-West's credit without exonerating defendants. (Cf. *Bank of America etc. Assn.* v. *Sage* (1936) 13 Cal.App.2d 171, 175-196 [56 P.2d 565]; *Kierulff & Ravenscroft* v. *Koping* (1928) 94 Cal.App. 473, 478-479 [271 P. 353]; *Lean* v. *Geagan* (1912) 20 Cal. App. 260, 262-264 [128 P. 792].) Neither do we read the provisions authorizing USLC to change the amount, time or manner of payment of rent, to change any of the terms, covenants, conditions or provisions of the lease, or to amend, modify, change or supplement the lease (see fn. 3, *ante*), as a consent to the inclusion within the guaranty of a subsequent

50 percent increase in the amount of the equipment to be leased. Although defendants' written guaranty authorized certain changes in the lease (see fn. 3, *ante*), it did not authorize any change in the basic character of the lease as being one covering equipment "in the amount of $100,000.00."

We must now determine whether defendants' liability under their guaranty as it has been set forth has accrued.

"The obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal. . . ." (Civ. Code, § 2809.) Therefore, since the liability of a surety is commensurate with that of the principal, where the principal is not liable on the obligation, neither is the guarantor. (See *Bloom* v. *Bender, supra,* 48 Cal.2d 793, 803; *Atowich* v. *Zimmer* (1933) 218 Cal. 763, 769 [25 P.2d 6]; *Garfield* v. *Ford, supra,* 191 Cal. 69, 71; *Glassell* v. *Coleman* (1892) 94 Cal. 260, 268 [29 P. 508].) Consequently, no liability can be imposed upon defendants as guarantors unless Cal-West is liable under the lease. (See *Somers* v. *United States Fid. & Guar. Co., supra,* 191 Cal. 542, 546.)

Since, as we have said, the trial court found that defendants had guaranteed USLC against economic loss arising out of its performance under the lease commitment letter as well as the lease, the court made no findings as to the existence or the extent of Cal-West's liability under the lease alone. Nevertheless, where, as here, the existence of liability depends upon the interpretation of written instruments in the light of uncontradicted extrinsic evidence, the question is properly one of law for our determination. (See *Parsons* v. *Bristol Dev. Co., supra,* 62 Cal.2d 861, 865-866.)

The lease provided for rent as follows: "The rent for any and every item of *equipment described in the schedule* shall be the *amount designated in the schedule.* Lessee shall pay lessor said rent in advance, *in the amounts and at the times set forth in the schedule,* . . ." (Italics added.)

It will be recalled that on June 9, 1961, Cal-West filed a petition for an arrangement under chapter XI of the Bankruptcy Act. At that time it had already accepted about $100 000 worth of equipment described in the supplier's invoices each of which had been approved by Harper who in turn had requested USLC to pay the supplier. The invoice procedure specified in the lease commitment letter provided in part: "Upon return of the accepted and approved invoice we will then issue a payment schedule based on the figures contained in the Lease Payment Proposal. *Upon your acceptance*

of this schedule we will then remit payment to the vendor for the equipment." (Italics added.) The only schedules executed by the parties were Schedules Nos. 1 and 2, executed after USLC made the progress payments to Cal-West's supplier. USLC claimed and the trial court found, that these schedules were intended merely to be interim schedules which would be replaced upon the execution of a final schedule as provided in the invoice procedure set forth in the lease commitment letter (see fn. 2, *ante*). Schedules Nos. 1 and 2 clearly did not constitute the schedules contemplated by the provisions of the lease which schedules were to set forth the description of the leased equipment, the date on which the term of the lease ended, and the amounts and time for the payment of rent, and by the invoice procedure provisions of the lease commitment letter, stating that such payment schedule would be issued upon Cal-West's return of the accepted and approved invoice.

Therefore, liability of Cal-West for rent due under the lease based upon these interim schedules must be found, if at all, in the provisions of the guaranty authorizing USLC to change the amount, time or manner of payment of rent or other sums reserved in the lease, to change any of the terms, covenants, conditions or provisions of the lease, and to amend, modify, change or supplement the lease.[15] (See fn. 3, *ante*.) We do not interpret the foregoing provisions as authorizing the execution of such interim schedules so as to bring them within the ambit of the guaranty. The basic terms of the lease contemplated were those set forth in the lease commitment letter. The lease covered $100,000 worth of restaurant and kitchen equipment and the amount and time for payment of rent reserved in the lease was fixed at "60 monthly payments of $2,102.00 each followed by 3 annual payments of $3,000.00." That document further stated: "This commitment will be effective until April 15, 1961, and the equipment covered by same must be delivered, accepted and placed on a lease schedule by that date," and later in the section designated "INVOICE PROCEDURE" set forth the procedure for accepting the equipment and placing it on a lease schedule. (See fn. 3, *ante*.)

[15]Since we already have concluded that the provision of the guaranty permitting USLC to increase Cal-West's indebtedness and obligations (see fn. 3, *ante*) did not provide that such increased indebtedness and obligations would be encompassed within the guaranty, but merely that Cal-West's indebtedness and obligations might exceed defendants' maximum liability thereunder, no reliance may be placed on such provision to impose liability on defendants based on Schedules Nos. 1 and 2.

Schedule No. 1, however, obligated Cal-West to pay in the form of "rent" $51,500, payable at $500 on March 8, April 8 and May 8, and $50,000 on June 8, for "Advance Payment to be used for progress payments to vendor." Schedule No. 2 was similar to the first schedule except that it called for a "rent" of $102,000 payable on June 5. The secretary and counsel of USLC testified that the words "Advance Payment" referred to the payment which USLC made or intended to make to the supplier and that the schedules were executed partly to provide USLC with some evidence of Cal-West's indebtedness to USLC after the latter had made such payments. Neither schedule described the property to be leased as provided in the lease and neither conditioned payment of "rent" on delivery of the equipment by the supplier or acceptance of the invoice therefor by Cal-West. Thus, rather than providing for "rent" for the *leasing* by Cal-West of equipment in the amount of $100,000, Schedules Nos. 1 and 2 referred to "Advance Payments" made by USLC for the *purchase* by USLC of equipment in the amount of $150,000.

It is apparent from the whole tenor of the documents that the schedules were intended to provide for reimbursement to USLC for its costs in purchasing such equipment in the event no final schedule was executed. In their legal effect therefore the schedules instead of imposing on Cal-West an obligation under the lease for the payment of rent totaling $135,120 over a period of eight years commencing after the equipment had been delivered and the invoice accepted by it. imposed on Cal-West an obligation collateral to the lease for the unconditional reimbursement in three months of $153,500 representing not rent but the cost of the equipment plus interest. We cannot construe the provisions in the guaranty relating to modifications of the lease as encompassing such a fundamental and radical change in the nature of Cal-West's obligation. Indeed, such obligation could not be described as a lease of personal property, or in the terms of the Civil Code a "hiring" thereof. (See Civ. Code, § 1925; *Rice Bros., Inc.* v. *Glens Falls Indem. Co.* (1953) 121 Cal.App.2d 206, 209 [263 P.2d 39].)

Therefore we conclude that no payment schedule as was contemplated in the rent provisions of the lease was ever issued for Cal-West's approval and that when on June 9, 1961, Cal-West filed its petition in bankruptcy, no payment of rent on the subject equipment was yet due. The trial court found: "No final schedule to the lease was executed only because of the intervening bankruptcy of Cal-West." But

this finding of itself does not establish a liability on Cal-West and therefore on defendants. Further inquiry must be directed to a determination whether the act of instituting bankruptcy proceedings worked an imposition of liability on Cal-West under the lease.

The lease specifically provided for the contingency of bankruptcy as follows: "Neither this lease nor any interest therein is assignable or transferable by operation of law. If any proceeding under the Bankruptcy Act, as amended, is commenced by or against the lessee, . . . lessor shall have *and may exercise* any one or more of the *remedies* set forth in paragraph 17 hereof; *and this lease shall, at the option of lessor, without notice, immediately terminate* and shall not be treated as an asset of lessee after the exercise of said option."[16] (Italics added.) However, the remedies set forth in paragraph 17 (see fn. 16, *ante*) were available to USLC "If lessee with regard to any item or items of equipment fails to *pay any rent* or other amount herein provided *within ten (10) days after the same is due and payable,* or if lessee with regard to any item or items of equipment fails to observe, keep or *perform any other provision of this lease required to be observed,* kept or performed by lessee, . . ." (Italics added.) Accordingly since no rent was yet due and payable under the lease, no remedies became available to USLC under paragraph 17 upon the commencement of Cal-West's bankruptcy proceedings. In short,

---

[16]Paragraph 17 provided: "Default. If lessee with regard to any item or items of equipment fails to pay any rent or other amount herein provided within ten (10) days after the same is due and payable, or if lessee with regard to any item or items of equipment fails to observe, keep or perform any other provision of this lease required to be observed, kept or performed by lessee, lessor shall have the right to exercise any one or more of the following remedies: (a) To declare the entire amount of rent hereunder immediately due and payable as to any or all items of equipment, without notice or demand to lessee. (b) To sue for and recover all rents, and other payments, then accrued or thereafter accruing, with respect to any or all items of equipment. (c) To take possession of any or all items of equipment, without demand or notice, wherever same may be located, without any court order or other process of law. Lessee hereby waives any and all damages occasioned by such taking of possession. Any said taking of possession shall not constitute a termination of this lease as to any or all items of equipment unless lessor expressly so notifies lessee in writing. (d) To terminate this lease as to any or all items of equipment. (e) To pursue any other remedy at law or in equity.

"Notwithstanding any said repossession, or any other action which lessor may take, lessee shall be and remain liable for the full performance of all obligations on the part of lessee to be performed under this lease.

"All such remedies are cumulative, and may be exercised concurrently or separately."

no schedules designating rent having been issued or made a part of the lease, there was simply nothing from which the bankruptcy clause could generate a liability for rent on the part of Cal-West.[17]

Furthermore, the record makes clear that USLC was not asserting remedies under the lease. In the first place while purporting to demand that defendants pay the rent due under the lease, USLC in fact sought to recover on the *collateral* schedules which, we have explained, did *not* designate the rent for the lease of equipment as contemplated by the parties. Thus its demand letter dated June 16 directed to defendants stated in part: "Rent under said Lease [dated February 23] in the amount of $51,000 became due to us on June 8, 1961, but despite our demands for payment thereof Cal-West has failed to make such payment. We therefore hereby make demand upon you to pay us said rent."[18] Indeed the record plainly shows by USLC's own admission at trial that it *terminated* the lease upon commencement of Cal-West's bankruptcy proceedings. USLC's secretary and general counsel, in explaining why a final payment schedule had not been issued and made a part of the lease as contemplated by the lease commitment letter, testified that this had not been done "Because, *under the bankruptcy provision* in the lease we decided, United States Leasing decided not to go through with the transaction, as it had a legal right to do." (Italics added.) While the trial court made no express finding that the lease had been terminated, USLC's uncontradicted statement that it had done so is consonant with the court's finding that "No final schedule to the lease was executed only because of the intervening bankruptcy of Cal-West." In sum, USLC sought to recover not on the basis of the lease provisions

[17]Having concluded that USLC had no available remedies under the lease, we also conclude that the lease provision that Cal-West shall pay USLC all costs and expenses, including attorneys' fees, incurred in exercising any of its rights and remedies thereunder or in enforcing any of the terms, conditions or provisions thereof is not applicable herein. Furthermore, since no rent was therein reserved and no other sums were required to be paid to USLC, the provision that Cal-West shall upon the expiration of 10 days after the due date pay USLC interest on such delinquent payment at seven percent also is not applicable herein.

[18]The demand letter continued: "As you know the total *cost* of the equipment under our lease with Cal-West is $150,000. Although we have not as yet paid the manufacturer of the leased equipment approximately $100,000, such payment will be made by us within the near future. Upon our payment to the manufacturer of this remaining amount, Cal-West will thereupon become obligated to us under the lease for *a similar amount*. If Cal-West is unable to meet this obligation we shall naturally call upon you to make the payment to us pursuant to the terms of your guaranty." (Italics added.)

which were devoid of any rent schedules but rather on the basis of Schedules Nos. 1 and 2, which were collateral to the lease and not encompassed within the terms of defendants' guaranty.

As we have indicated at the outset, we do not reach the issue whether the adoption or attempted adoption by USLC and Cal-West of Schedules Nos. 1 and 2 as part of the lease materially altered the principal contract without defendants' consent and exonerated them from any liability under their guaranty. Rather we conclude that even assuming defendants were not exonerated, they incurred no liability under it because none accrued.[19] Since this is so, it necessarily follows that USLC cannot complain because of defendants' failure to deliver financial statements or deposit collateral for the performance of their guaranty, even assuming that the demand[20] therefor satisfied the notice provisions of the supplementary agreement. (See fn. 8, *ante.*) Finally, our determination that defendants have incurred no liability under the guaranty makes it unnecessary for us to consider their remaining contentions on appeal.

The judgment is reversed and the cause is remanded with directions to the trial court to amend the findings of fact and conclusions of law and to enter judgment in favor of defendants in conformity with the views herein expressed.

McComb, J., Peters, J., Tobriner, J., Mosk, J., Burke, J., and Schauer, J.,* concurred.

Respondent's petition for a rehearing was denied September 18, 1968. Schauer, J.,* sat in place of Traynor, C. J., who deemed himself disqualified.

---

[19]Having concluded that defendants have no enforceable liability under their guaranty, the guaranty provision that they pay USLC a reasonable attorney's fee and all other costs and expenses which may be incurred by USLC in the enforcement thereof also is not applicable herein.

[20]USLC's letter dated June 19 stated: "We further request and hereby demand, pursuant to the terms of said 'Supplementary Agreements,' that you deposit with us, as collateral for the performance of your guaranty of the lease agreement between Cal-West and this corporation, the amount of $100,000 in cash or readily marketable securities in addition to payment of the $51,000 demanded above as performance of your guaranty agreement. We make this demand for the deposit of collateral because of the fact, among others, that Cal-West Aviation, Inc. on June 9, 1961, filed a petition under Chapter XI of the Bankruptcy Act for a reorganization of its affairs."

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.