CHRISTEN,
dissenting.
I would reverse the judgment of the bankruptcy court.
Reviewing de novo, I conclude that the terms of the Repurchase Guaranty can only be reconciled if the waiver of the right to contribution was confined to the co-guarantors’ obligation to satisfy Pulte. The Repurchase Guaranty is express in stating that it was only intended to benefit Pulte, the obligations imposed by the Guaranty expired as soon as Pulte was paid, the .circumstances under which the Guaranty was executed are entirely consistent with that limited purpose, and Alameda conspicuously offers no alternative explanation why Tsakopoulos and Vail would have otherwise agreed to shoulder Alameda’s share of the $5 million burden without receiving any consideration for doing so. For these reasons, I respectfully dissent.
First, we must enforce the parties’ agreement according to their intent. “The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the ‘mutual intention’ of the parties.” ASP Props. Grp. v. Fard, Inc., 133 Cal.App.4th 1257, 35 Cal.Rptr.3d 343, 351 (2005) (citation omitted). As the majority acknowledges, the Guaranty expressly states that it was only intended to benefit *432 Pulte, The Guaranty was “for the sole protection and benefit of Pulte ,., and no other Party shall be a direct or indirect beneficiary of, or shall have any direct or indirect cause of action or claim in connection with [the Repurchase] Guaranty.” Neither the parties nor the majority suggest that this language is ambiguous and neither advance a persuasive argument why Alameda should be able to construe the Guaranty to its benefit, and to its co-guarantors’ detriment. The Guaranty is also express in providing that, once Pulte was satisfied, the parties were excused from any further performance: “All covenants, agreements, representations and warranties made in this Guaranty survive the execution and delivery of this Guaranty, and shall continue in full force and effect so long as any Repurchase Obligation is unsatisfied,” (emphasis added). The parties do not dispute that Vail and Tsakopoulos fully satisfied Pulte without Alameda’s help. In keeping with the parties’ plain objective, the Guaranty reiterates that the waiver of the right to contribution remained in effect only “so long as any Repurchase Obligation remain[s] unsatisfied,” and further specified in Paragraph 4(a)(1) that each guarantor waived the “right to require Pulte to marshal assets ... or to proceed against ... any other Party.”
Second, the circumstances in which the Guaranty was executed support the contract interpretation offered by Tsakopou-los and Vail, not the one offered by Alame-da. The Guaranty was executed when Tsakopoulos, Vail, and Alameda held title to a 208-acre parcel of real estate they hoped to sell to Pulte. Pulte learned that certain permits were needed in order to develop the property, and he notified the sellers that. he was not willing to go through with the deal. It was in an effort to salvage the sale that the three co-guarantors agreed to individually obligate themselves to repurchase the parcel from Pulte if, within a year, it was not possible to secure the necessary permits. The co-guarantors bound themselves to be jointly and severally liable for the repurchase obligation. The consideration for the Guaranty was Pulte’s agreement to close on the sale. Unremarkably, the express purpose of the Guaranty was to insure that Pulte was paid: the Guaranty said as much, the co-guarantors explicitly waived any ability to insist that Pulte proceed against them in any particular order, and they waived the right to seek contribution among themselves until Pulte was fully satisfied (they also agreed to pay his fees and costs). It is important to recognize the uncontested context in which the Guaranty was executed. It was Pulte who extracted the promise to repurchase the property and it is clear that he had every reason—and the leverage—to insist that if it became necessary to invoke the Repurchase Guaranty, the co-guarantors would have no right of contribution between each other unless and until he was fully paid. The language and circumstances of the Repayment Guaranty make the parties’ intent clear: Pulte would be paid if the repurchase obligation was triggered, and the inevitable problem of settling up the guarantors’ statutorily-guaranteed right to contribution was left to the guarantors to sort out.
I agree with the majority that the waiver of the right to contribution was prospective, but this is entirely consistent with the language specifying that the Guaranty was to operate for Pulte’s sole benefit. With 20-20 hindsight, we know that two of the co-guarantors fully satisfied Pulte. But if it had come to pass that Pulte had been only partially satisfied, the prospective waiver of the right to contribution would have protected him against the possibility that a guarantor who contributed more than his fair share would have been able to seek *433 contribution from the others. Even the majority acknowledges that the obligation to settle up would have arisen whether Pulte had been fully satisfied or not because once a co-obligor pays for “more than his share, the one paying possesses a new obligation against the others for their proportion of what he has paid for them.” Morgan Creek Residential v. Kemp, 153 Cal.App.4th 675, 63 Cal.Rptr.3d 232, 238 (2007) (citation omitted). Reading the Guaranty’s waiver to account for the possibility that one or two guarantors could have been owed contribution before Pulte was fully satisfied .harmonizes the terms- of the instrument.
The majority counters that if only Pulte were allowed to benefit from the Repurchase Guaranty, Appellants’ own bankruptcy claims would be barred. Respectfully, the majority has this backwards. Pulte’s status as the sole beneficiary of the Repurchase Guaranty is precisely why Vail and Tsakopoulos do have claims to assert in bankruptcy. The majority’s mistaken premise is its view that the right to contribution arose from the Repurchase Guaranty. In fact, only the co-guarantors’ joint obligation to repay Pulte arose from the Repurchase Guaranty; the right to contribution—the claims Vail and Tsakopoulos asserted in bankruptcy—arose when Vail and Tsakopoulos paid more than their fair share to satisfy the joint debt owed to Pulte. The majority recognized that the right to contribution is guaranteed by California law, and correctly cited Morgan Creek, 63 Cal.Rptr. at 238 (“The equitable right to contribution only comes into existence after a co-obligor makes payment on a shared obligation”), but the majority failed to apply this rule,
Alameda offers no response to the elephant in the room: while all three guarantors had ample reason to individually accept the obligation to make Pulte whole— unless they did so, he would not have purchased the property—they had zero reason to agree to waive the right of contribution guaranteed by statute and by the common law which protected each of them if, as happened here, one or two wound up footing the entire bill. In my view, this gaping hole in Alameda’s theory is telling. The majority’s only response is the observation that Appellants “may have waived more rights than necessary to induce Pulte to continue with the sale.” But this misses the real point: there is no reason to think that Pulte would have been induced by a waiver of the right to contribution between the co-guarantors. The way the co-guarantors allocated the ultimate burden, among themselves, made no difference to Pulte. As reflected in the contract’s express provisions that: (1) the Guaranty was for Pulte’s sole protection and benefit; (2) the co-gúarantors waived any ability to insist that Pulte proceed against them in any particular order; and (3) the warranties in the Repurchase Guaranty were to continue in effect only so long as any Repurchase Obligation remained unsatisfied, Pulte had no interest in how the co-guarantors settled up between themselves after he was paid. It is the court’s obligation to interpret the Repurchase Guaranty contract, see U.S. Leasing Corp. v. duPont, 69 Cal.2d 275, 70 Cal.Rptr. 393, 444 P.2d 65, 71 (1968) (“[I]t is solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence.”) (citation omitted), and the theory that Vail and Tsako-poulos would have released Alameda from the co-obligation, for no consideration, is not explained by the majority.
I agree that the parties’ discussion of third party beneficiary status is not on point. As a party to the contract, Alameda was not required to show that it was an intended third party beneficiary. But being a party to the Guaranty is not the same *434 thing as being a promisee. “[T]he intended beneficiary bears the burden of proving that the promise he seeks to enforce was actually made to him personally or to a class of which he is a member.” Spinks v. Equity Residential Briarwood Apartments, 171 Cal.App.4th 1004, 90 Cal.Rptr.3d 453, 470 (2009) (internal quotation marks and citation omitted). The co-guarantors obligated themselves to joint and several liability when and if it became necessary to repurchase property, but the Guaranty extended no farther than that.
Because Alameda offers no coherent interpretation of the Repurchase Guaranty from which I can glean an agreement by Tsakopoulos and Vail to release their co-guarantor from the right to seek contribution, I respectfully dissent.