[Civ. No. 25703. First Dist., Div. Four. Oct. 31, 1969.]

1880 CORPORATION, Plaintiff and Respondent, v.
ATLAS CORPORATION, Defendant and Appellant.

## COUNSEL

McCutchen, Doyle, Brown & Enersen, William W. Schwarzer and David M. Heilbron for Defendant and Appellant.

Brobeck, Phleger & Harrison, Gregory A. Harrison, David W. Lennihan and Duncan E. Haynes for Plaintiff and Respondent.

## OPINION

**DEVINE, P. J.**—Plaintiff corporation was awarded judgment in the amount of $1,918,567.38 on a contract of guaranty.

Plaintiff, The 1880 Corporation (herein called 1880), which was wholly owned by Dollar Associates, Inc., had purchased an airplane in 1957 for two and a half million dollars. Negotiations were commenced between 1880 and Transocean Air Lines (herein called TAL), an operating airline, for leasing of the aircraft for five years with an option to lessee to purchase. TAL was almost wholly owned by Transocean Corporation of California (herein called TCC).

During the period of negotiations for the lease, defendant, Atlas Corporation, a New York based investment company, became interested in selling one of its wholly owned subsidiaries, the Babb Company, a corporation engaged in the sale and maintenance of aircraft, to TCC. The sale did occur, on July 1, 1957. On July 9, 1957, the lease of the airplane from 1880 was made. Performance by TCC was guaranteed by Babb. Atlas admittedly is responsible for whatever may be Babb's liability. Default in the lease payments occurred in 1959; the aircraft was abandoned by the lessee at Bradley Field, Connecticut; demand was made upon Babb to perform under its guaranty.

The guaranty contains a release provision, the interpretation and effect of which is the core of this case. It reads: "The obligations of Babb hereunder shall remain in force and effect only until such time as the Transocean Corporation of California shall have received funds aggregating the sum of at least Three Million Three Hundred Thousand Dollars ($3,300,000) from the issuance and sale (whether public or private) by it of debt or equity securities, or both, or the consummation of a merger of Babb and such corporation, whichever shall first occur, and in such event Babb automatically shall be and be deemed to be released from any obligation or liability whatsoever hereunder."

### I. APPELLANT'S CONTENTIONS

Appellant, Atlas Corporation, does not dispute the amount due to 1880

from TAL and TCC (default judgments were entered against both of these defendants, the corporations being insolvent), but asserts release under the quoted portion of the agreement on these grounds:

1. That TCC did receive funds aggregating at least $3,300,000 from the issuance of debt securities, namely, promissory notes, to appellant Atlas.

2. That even if the promissory notes be not deemed securities, the amount of funds supplied by Atlas to TCC having been in excess of $3,300,000, the guaranty should be considered discharged.

3. That the Dollar interests which owned 1880 prevented timely approval of long-term debt securities and therefore 1880 is precluded from holding Babb to the guaranty.

## II. STATE OF THE CASE

The trial judge decided that the promissory notes of TCC, of the type involved in this case, are not "securities" as that word is used in the guaranty; that when the parties were closing the transaction they had in mind not a loan in the nature of temporary relief by way of an in-and-out transfusion of funds, but rather a long-term investment evidenced by the issuance of stock, debentures, or long-term convertible notes. This we know not only from the findings and conclusions of law but also from the judge's memorandum opinion. He made a finding that the funds received by TCC and TAL from Atlas were advanced to meet the most pressing needs of these corporations and were not equivalent to the funds contemplated by the guaranty. The judge found that the Dollar interests did not prevent issue of the securities of the kind required by the guaranty.

## III. MEANING OF THE WORD "SECURITIES" AS USED IN THE GUARANTY

■ Appellant contends, and we accept its contention, that because there was no conflict in the evidence as to credibility of witnesses, and, indeed, a large amount of the evidence was documentary, this court must make its independent judgment of the meaning of the essential provision of the contract, that which relates to release of the guaranty, even though extrinsic evidence was admitted. (*United States Leasing Corp.* v. *DuPont,* 69 Cal.2d 275, 284 [70 Cal.Rptr. 393, 444 P.2d 65]; *Parsons* v. *Bristol. Dev. Co.,* 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].)

### A. *The Word Itself*

■ The word "securities" has no precise legal definition which is good for all transactions; it is a term flexible in meaning. (79 C.J.S. 944.) Although the term may include promissory notes under certain circumstances, we are of the opinion that, ordinarily, the term is understood in the manner expressed as follows: "It is now established by the clear preponderance of authority in this country that in the general usage of speech

employed by men of business affairs the words 'security' and 'securities' are used in their widest sense to describe a broad class of financial investments, and those instruments, secured or unsecured, which are used for the purpose of financing enterprises and promoting a distribution of rights in or obligations of such enterprises, and which are designed as a means of investment, are termed 'securities,' but, by modern business methods, those instruments which are used only to facilitate dealings in commodities, such as short-term notes, bills of exchange, bills of lading, and all other instruments of the commercial banker, are not referred to as 'securities' although they may be collaterally secured in some way." (79 C.J.S. 944.)

Although the notes issued by TCC did not "facilitate dealings in commodities" (except, perhaps, incidentally), they were used for the purpose of gaining funds with which to pay past due bills and current liabilities. The notes were for no longer than 90 days. They were issued at various times over a period of months. During that time, Atlas was repeatedly requested to supply funds, which it refused to supply because it was not receiving adequate financial information from TCC. The dealings between TCC and Atlas, therefore, insofar as notes are concerned, had to do with immediate—almost emergency—conditions.

Besides the general understanding of the word "securities" as stated above, we note that the release provision of the guaranty refers to the receipt of $3,300,000 from *issuance* and *sale,* whether public or private, of debt or equity securities, or both. "Issuance" and "sale" are words peculiarly adapted to the emergence of long-term equities or obligations. It is true that the word "issue" means the first delivery of an instrument to a holder or a remitter (Com. Code, § 3102, subd. (1)(a)), but the provision in the contract refers to issuance *and* sale. One does not ordinarily speak of the *sale* of a promissory note as describing its execution and delivery to the payee. It is true that the word "sale," as defined for "blue sky" regulation, includes every disposition of a security or interest in a security for value. (Corp. Code, § 25017.)

It is true, too, as appellant argues, that the California Corporate Securities Act, at the time of this transaction, included "any note; evidence of indebtedness" (Corp. Code, § 25008; now Corp. Code, § 25019), although promissory notes which are not offered to the public are not subject to regulation (Corp. Code, § 25102, subd. (e)). But there is no evidence that the parties intended to adopt the definition given in the Corporations Code. Those definitions obviously were made of a sweeping nature so that, in the absence of exceptions, there would be regulation of the offerings of all manner of corporate equities or evidence of debt. For example, in *People* v. *Walberg,* 263 Cal.App.2d 286 [69 Cal.Rptr. 457] (cited by appellant), the broad defintion of security in Corporations Code section

25008 was useful in its relation to proscribing promissory notes which were offered from a pulpit and on a daily radio broadcast, and the dissemination of which was promoted by widespread distribution of literature. The situation bears no resemblance to the facts in the case before us. The promissory notes which appellant contends are securities had a single payee, Atlas Corporation. Appellant cites the broad definitions of "securities" contained in other regulatory acts (Securities Act of 1933, 15 U.S.C. § 77 (b)(1); Federal Investment Company Act of 1940, 15 U.S.C. § 80a-2 (35)), and acts relating to escheat (Code Civ.Proc., § 1360, subd. (c)), to gifts to minors (Civ. Code, § 1155, subd. (m)), to reorganization (Fin. Code, § 9505); but these are of a special nature. These definitions have been chosen by legislative bodies for particular laws. They do not necessarily express the intention of parties to a contract. "The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed." (Civ.Code, § 1644.) The ordinary and popular sense, and one not altered by usage, of the word securities, we find to be that expressed in the quotation from Corpus Juris Secundum, *supra*. We proceed to consider the acts of the parties.

## B. *Acts of the Parties*

### 1. *Acts in Which Parties' Counsel Directly Participated*

The guaranty agreement and the provision for its release came to 1880 from house counsel for TCC, who was representing Atlas on the details of the negotiation. Therefore, under the well-known rule, interpretation of the agreement, other things being equal, would be resolved against appellant. (*Superior Wholesale Elec. Co.* v. *Cameron,* 264 Cal.App.2d 488, 493 [70 Cal.Rptr. 636].) In the case before us, therefore, we shall give some recognition to this fact; but not nearly so much weight as might be allowed in many other cases, because of the scrutiny which was given to the transaction by respondent's counsel, too, from the time of its inception.

We come next to the subject of the Hilton agreement. At about the time of the leasing of 1880's aircraft, another airplane was being leased to appellant by Barron Hilton. The Hilton agreement was identical in almost all respects with 1880's, but the provision for securities in the Hilton agreement was that the securities shall have a maturity date subsequent to the expiration of the lease. It is argued by respondent that the two transactions were pursuant to a common plan and that, therefore, the meaning of the guaranty in the Hilton lease is persuasive as to the meaning of the 1880 guaranty.

We do not find this argument convincing. Respondent 1880 sought

reformation of its contract in the trial court, to include words missing from its agreement but contained in that of Hilton. The trial judge denied reformation and there has been no cross-appeal. The judge's reasoning is that 1880 was acting independently on the business and legal acumen of its officers and attorneys; that it has received the deal for which it negotiated; that where there had been expressions during the course of negotiations as to identity of the contracts, the reference was to the lease and option and not to the guaranty; that 1880 had chosen to close its deal without waiting for the consummation of the Hilton deal. To review the evidence on this subject in this opinion is unnecessary. It suffices to say that we agree with the trial judge and, further, that we decide that the evidence on this subject not only failed to support the cause for reformation but also that it is of no significant weight in deciding the matter presently before us.

### 2. *Acts Prior to and at the Time of Making the Agreement*

(Of course, the conduct of the parties which is discussed under this heading was carried on to greater or less degree with the advice of counsel. But it has been convenient to place it in a separate heading from that in which counsels' activity is more patent.) The evidence extrinsic to the agreement itself is important in interpreting the contract. A vast amount of documentary evidence was introduced as well as a large quantity of testimony. No single item is conclusive. Indeed, from many of them each side would have us draw inferences favorable to it. We shall give in this opinion some of the major elements of evidence which throw light upon the meaning of the contract.

Early in 1957, Atlas negotiated with TCC for the sale of Babb to TCC. The original plan was that TCC would issue to Atlas $3,000,000 in convertible preferred stock, $3,000,000 in convertible subordinated debentures and $1,000,000 in common stock. The plan was subject to successful underwriting of a public issue of securities amounting to $6,700,000 over and above securities which were to be transferred to Atlas, and to modification of the Dollar option which is described below.

On June 26, 1957, TCC wrote to Dollar Associates, Inc., informing that company of the current program agreed on between TCC and Atlas. Because of the critical cash position of the airline, TAL, interim financing was necessary; wherefore, Atlas agreed to lend $1,340,000 in cash forthwith to Babb (which would supply this to TCC). TCC would issue its 90-day note for $8,340,000 to Atlas ($7,000,000 as the purchase price for Babb, $1,340,000 for the cash). This note, however, would upon approval of the Civil Aeronautics Board be converted into preferred stock, convertible debentures and common stock. In the fall of 1957, following CAB approval, TCC would issue a minimum of $2,060,000 of securities which Atlas would take up or arrange to have taken up. The balance, if

any, of the $6,700,000 public financing would be undertaken, probably, in 1968. The $8,340,000 note is referred to in the letter as an "interim note."

By the terms of this letter, every instrument by which a supplier of funds to TCC was to be secured was expected to be a debenture or a certificate of stock, although there was to be an *interim* note. True, the $2,060,000 financing is referred to with the use of the very term which must be construed in answering the ultimate question in the case; but there is extrinsic evidence to help in the interpretation of the June 26, 1957, letter (which is itself extrinsic evidence). It is the testimony of Hamilton K. Smith, vice president of Atlas, given at a CAB hearing. He testified that it was not intended that the note for the purchase price be paid off, but that upon CAB approval, it would be converted to stocks, preferred and common, and convertible notes. He testified, too, about the "$2 million over and above the $1,340,000," saying that "It was envisioned at the time [July 1957] that $2 million would develop from a public issue."

The tone of the letter of June 26, 1957, and the cited testimony about its subject matter, tend to show that the "securities" referred to were not demand notes or short-term notes. Promissory notes are not spoken of except as to the "interim" large note which no one contends to have been part of the contemplated "securities."

Following the June 26 letter, 1880 proposed the leasing of the aircraft in a letter to TAL. Reference was made, by way of an exhibit, to certain financing which TCC "is presently taking steps to obtain." This language comports more agreeably with a single issue, currently under preparation, than with a succession of later advances secured by notes of varying amounts and dates over a period of months. The language is not conclusive of intent; it is simply one more item of evidence to be weighed.

Appellant argues that there were essentially *two* transactions involved in the business between TCC and Atlas: the first, the acquisition of TCC by Atlas, for the funding of which long-term securities or equities were contemplated; and the second, immediate financing to meet TCC's current distress, which was to be relieved by the $1,340,000 advance plus an additional $2,000,000, the means of obtaining which were left completely open. As between TCC and Atlas, this may well have been the case. But we do not have evidence which demonstrates to us, some 12 years later, that 1880 was made aware of a bifurcated plan and agreed to it. The written agreement between Atlas and TCC refers to Atlas' undertaking to use its best efforts in obtaining $2,000,000 in additional funds "either through a public offering of Transocean securities or otherwise." Appellant stresses the words "or otherwise," and points out that the Dollar people knew of this agreement

because their consent to it was required by a prior loan contract. But the sentence refers to Atlas' *obtaining* the funds, a word suggestive of financing by third persons. Besides, the communications between the parties affected, 1880 and TCC and TAL, are more important. There as well as in the release of guaranty clause itself, the word "securities" predominates.

### 3. *Conduct of the Parties Following the Agreement*

#### (a) *Silence*

Between the time of the execution of the agreement on July 9, 1957, and the demand by 1880 following TAL's default in November 1959, there was no reference to the guaranty in any way, by writing or orally, in any communication going in one direction or the other between 1880 on the one side and TAL, TCC, Babb or Atlas on the other. Although appellant attempts to make a point in its favor from this silence, we believe that the correct inference is adverse to appellant. According to appellant's own chart of advances made to TCC, it was not until 1958 that Atlas and Babb had supplied $3,300,000 to TCC. During the interim, we take it, the guaranty undeniably remained. If it were the expectation of Atlas that the guaranty had then been satisfied—a guaranty which, considering the difficult financial position of TAL and TCC, ought to have been regarded as burdensome and perhaps dangerous—would not Atlas or Babb have announced the fact that the sum they deemed sufficient to discharge the guaranty had now been advanced, and would not these companies have proclaimed their freedom from further suretyship?

Appellant pleads that had 1880 asserted continuation of the guaranty, 1880 might have taken steps to correct the situation. But the guaranty was a continuing obligation until the event happened which would discharge it. The holder of the guaranty ordinarily would not be expected to seek reassurance that it remains in effect, but the guarantor, even if not legally obliged to do so, would be expected, upon fulfilment of the conditions which the guarantor deemed sufficient to discharge his obligation (especially in a complex situation such as existed in this case), to make an announcement of the claimed performance of the conditions.

#### (b) *Admissions*

(1) At the CAB hearing, William A. Sipprell, president of Babb, when asked if there were any amounts unpaid on items contained in a certain exhibit, replied: "We are also guarantors, we have been guarantors on two Model 1049-H Constellations that were acquired by Transocean Airline under lease purchase agreement from the Hilton interests, and Dollar interests, respectively." Appellant argues that this is not a concession that Atlas was then a guarantor to 1880 because of the words "we have been" in the sentence. But in the very next sentence Sipprell explained that the

Hilton aircraft had been sold; wherefore, the "have been" reference apparently was to the Hilton guaranty. There would have been no reason for Mr. Sipprell to admit that "We are also guarantors," except by way of reference to the 1880 guaranty. This testimony was given in April 1959, many months subsequent to the advancing of the sum of at least $3,300,- 000, according to appellant's account of the advances.

(2) A "Narrative History of the Negotiations" was submitted to the CAB, the document being "sponsored" by Mr. Smith, vice president of Atlas. This history refers to the existing guaranties of the 1880 and Hilton leases and to a proposal that Babb undertake to meet contingent losses under the guaranties, in return for which it was proposed that Babb issue a note to Atlas for $1,200,000.

Appellant argues that at the time the Narrative History was prepared, Atlas had not advanced the sum of $3,300,000, but the sum of $3,140,000; wherefore, although there may have been an admission that the guaranty existed at the time the history was prepared, this would not be an admission of liability continuing beyond such time as the total amount of $3,300,000 would have been supplied to TCC. The Narrative History nevertheless is something of an admission. There is no reference to prospective discharge of the guaranty either by supplying of further funds (that is $200,000) or otherwise, except by the proposal that Babb relieve TCC of certain obligations in connection with the aircraft lease.

(3) In an agreement between TCC and Atlas, dated November 20, 1958, it is agreed that all rights under the lease shall be assigned to Babb. Respondent contends that this agreement reaffirms the continuing liability of Babb under its guaranty to 1880. It does not do so expressly and the most that can be said for respondent in respect of the language of the assignment is that it is completely silent as to the guaranty.

(4) Early in 1959, when Babb asked for and received the consent of 1880 for an assignment by TAL of its rights under the lease, it was agreed between Babb and 1880 that "Nothing contained herein shall affect the letter agreement, dated July 9, 1957 between Babb and The 1880 Corporation."

To sum up, we conclude that the conduct of the parties following the agreement is generally in accord with the subsistence of the guaranty.

IV. SUBSTANTIAL COMPLIANCE

Under this heading, we discuss the contention of appellant that Atlas, by supplying substantial sums to TCC, provided the equivalent of what would have been obtained by TCC had equities or debentures been issued. Appellant argues that what 1880 was interested in most was a good cash position for TCC, so that the airplane could be leased, thus giving

1880 not only income but also providing for depreciation for tax purposes; that 1880 was not particularly interested in the guaranty; that TCC used funds supplied by Atlas for the same purposes (payment of its current bills, including the installments due to 1880) for which it would have used any funds obtained from long-term obligations or the issue of capital stock.

We need not relate the evidence cited by appellant to sustain these propositions. We have held that the word "securities," for the purpose of this contract, does not include short-term notes. This being so, the arguments that the same purposes were achieved as if the contract had been followed are unimportant. Besides, it would be largely speculative on our part to arrive at the conclusions urged by appellant. We cannot tell how important it was to 1880 to have the Babb guaranty. It is enough for us that it was put into the contract. It is obvious that a long-term debt or the issuance of stock by a corporation is more favorable to those dealing with that company than is a series of short-term obligations. This, indeed, was conceded by a witness for Atlas, one of its financial officers. Had Atlas undertaken to issue "securities," as that word is used in its ordinary sense, no doubt the consent of a regulatory body would have been necessary; the maturity date, if they were debentures, would have been known to 1880 as well as the exact amount due (unlike the situation where a series of notes was issued at the will of Atlas); Atlas might not have been so free as it was, being master creditor, to arrange the disposition of TCC's assets as was done when, on November 20, 1958, TCC agreed to convey to Atlas many of its holdings.

Nor is appellant's argument that the maturity date of the short-term notes was extended by Atlas, and therefore made them long-term obligations, a convincing one. Appellant itself says, in its brief, that upon default of these notes Atlas was entitled to foreclose, but instead of doing so, granted extensions on the TCC notes. If, as a matter of accommodation (probably with its own interests in mind as well as those of TCC), Atlas chose to extend the due dates, this was an optional matter with Atlas. We must test the guaranty agreement as of the time of its making. The later conduct of the parties is useful in showing their intention when the contract was made. (*Crestview Cemetery Assn.* v. *Dieden,* 54 Cal.2d 744, 753 [8 Cal.Rptr. 427, 356 P.2d 171].) But the abstention by one party, on its own choice, from enforcing a legal right cannot change the meaning of the contract. The notes, when issued and when the funds were supplied, were demand or short-term obligations; they were not "securities."

## V. THE DOLLAR OPTION

Appellant contends that even if the trial court were correct (as we now decide it was) in deciding that the requisite securities were either stock or evidences of long-term obligations, respondent is not entitled to

judgment because respondent prevented the issue of such securities. Appellant offers as the legal and equitable bases of this argument the requirement of good faith of contracting parties, estoppel, and the law relating to increasing the burdens of a guarantor. We need not discuss the legal principles because we sustain the court's findings that it is not true that 1880 acted to prevent timely approval of the issuance of securities; that failure of the holder of the Dollar option (described below) to waive or modify the option did not prevent the issuance of the required kind of securities; that the option itself lapsed. ■ At this point, we are not exercising independent judgment on the interpretation of a contract; we are reviewing the effect of the conduct of the parties, the meaning of the contract being assumed for present purposes. Therefore, the usual principle of appellate review applies. If there is any substantial evidence to support the findings of the trier of fact, those findings must be sustained.

■ In 1953, Mr. R. Stanley Dollar (who was deceased at the time of the trial) had obtained from TCC, in return for a loan, the right to buy additional stock at $2.50 per share. The market value at that time was $7 per share. He also held an agreement forbidding dilution of his interest by issuance of additional shares without his consent, except that TCC could issue shares for money if Dollar were offered one share for $2.50 for every two shares issued to others. In 1957, when TCC and Atlas were negotiating and new securities of TCC were in prospect, Atlas asked Mr. Dollar for a waiver or modification of the option; Mr. Dollar replied that he had CAB and tax problems, but he would attempt to work it out to Atlas' satisfaction. The agreement between Atlas and TCC provided for rescission unless CAB approval was obtained by December 1957. The CAB would not grant approval until the option was modified. Mr. Dollar did not agree to modify until April 1958. In the interim, says appellant, various management and financial problems arose which prevented the issuance of securities.

We reject appellant's proposition on the following grounds:

1. Atlas obtained no firm promise from Mr. Dollar before it entered into this agreement in July 1957. It made its contract with TCC with full knowledge of the agreement which TCC had made with Dollar. It proceeded with its contract with no more than the promise of Dollar of an attempt to work things out, even while he expressed some doubt because of difficulties.

2. TCC could issue stock for money even under the Dollar contract, provided it complied with the terms of that contract.

3. We find nowhere in the evidence a demand by Atlas upon Dollar, coupled with a warning that the guaranty would be deemed released if he did not waive or modify his rights.

4. There is no clear evidence as to the reasons why the CAB hearings were continued to a date as late as April 1958. By that time, Atlas did have Dollar's consent.

5. Atlas was still trying to get CAB approval in 1959.

6. There is a good deal of evidence that the management problems of Babb and Atlas came about from internal disagreement. Therefore, the trial court might well find that these obstacles rather than delay in waiver of the option on the part of Mr. Dollar were responsible for the failure of the plan to issue securities.

The judgment is affirmed.

Rattigan, J., and Christian, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied December 23, 1969.