Filed 5/4/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| G & W WARREN'S, INC., <br><br>     Plaintiff and Respondent, <br><br>     v. <br><br> JUDSON V. DABNEY, II, <br><br>     Defendant and Appellant. | No. H042243 <br> (Monterey County <br> Super. Ct. No. M122308) |

We are confronted here with issues concerning the scope of a guaranty given to secure the buyer's obligations under a master agreement and various subsidiary agreements involving the purchase and sale of a motorcycle dealership. In addition, we address the circumstances under which the liability of the guarantor, by virtue of subsequent actions by the seller, may be exonerated.

Granville and Wanda Warren (the Warrens), through their corporation, G&W Warren's, Inc. (G&W Warren's), owned and operated a Harley-Davidson motorcycle dealership in Salinas for approximately 38 years. Intending to retire, the Warrens contacted a potential buyer, Judson V. Dabney, II (Dabney), who owned a Harley-Davidson dealership in Riverside. In November 2006, G&W Warren's and Dabney executed various agreements to accomplish the sale of the Salinas dealership, including a master "Asset Purchase Agreement" (Agreement) that incorporated by reference the other agreements. One of those agreements was a "Letter of Guaranty" (Guaranty) signed by Dabney, under which he "covenant[ed] and agree[d] . . . to guarantee . . . the collection and receipt of all amounts" required under section 2 of the Agreement, under the

promissory note(s), and under the lease. The Agreement also provided that Dabney could assign his rights and obligations as buyer to a corporation that he controlled, and that such assignment would relieve Dabney of all obligations under the Agreement. Dabney assigned his rights under the Agreement to Monterey Motorcycles, Inc. (Assignee or MMI).

Assignee ultimately defaulted on its obligations under the Agreement and the accompanying instruments, and the dealership was sold in August 2012 to a third party. G&W Warren's brought suit against Dabney. After a court trial based upon G&W Warren's claim that Dabney was liable under the Guaranty for Assignee's obligations, a judgment was entered in favor of G&W Warren's for the amount of $2,746,318.

On appeal, Dabney contends that the court erred in finding him liable for $537,399 and $567,136 under the covenant not to compete agreement and two consulting agreements, respectively. He contends the Guaranty did not cover the obligations under those three agreements that were signed by the parties at the time of the sale. Dabney also argues that the court erred in finding him liable at all. He asserts that, by virtue of G&W Warren's having agreed with Assignee to extend the deadline for payments and having provided it with additional loans—concessions to which Dabney did not agree— he was exonerated from any liability under the Guaranty.

We conclude that the court erred in concluding that Dabney was liable under the Guaranty for Assignee's obligations under the covenant not to compete and two consulting agreements. We reject Dabney's other claim of error. Accordingly, we will reverse the judgment and remand the case with instructions that the trial court enter a new and different judgment in favor of G&W Warren's and against Dabney in the amount of $1,641,783.27, plus interest, costs, and attorney fees.

PROCEDURAL BACKGROUND

G&W Warren's alleged in the first amended complaint filed June 12, 2013 (complaint), a single cause of action for breach of contract against Dabney. It alleged

2

that it entered into the Agreement, as seller (Seller),[1] with Dabney, as buyer (Buyer) in November 2006 for the sale of its Salinas motorcycle dealership for "$1,516,000.00, plus additional consideration." That additional consideration included amounts provided under a lease of the dealership space, a covenant not to compete executed by the Warrens, and separate consulting agreements signed by the Warrens. G&W Warren's alleged further in the complaint that the Warrens assigned their respective interests in the consulting agreements to G&W Warren's. The sale of the dealership closed escrow on or about March 1, 2007. G&W Warren's alleged that the last payments on the obligations under the Agreement and accompanying instruments occurred in August 2012, and that Dabney had failed and refused to make further payments that were owing.

Although no formal amendment of the complaint appears in the record, G&W Warren's proceeded to trial under the unpleaded theory that Dabney was liable under the Guaranty that secured Assignee's obligations under the Agreement and accompanying instruments involved in the sale of the dealership. In its pretrial brief, G&W Warren's noted that the Guaranty was not attached to complaint, but that it would seek leave to amend the complaint at trial to conform to proof. Further, at trial, counsel for G&W Warren's stated that his client was seeking recovery under the Guaranty of Assignee's obligations. Dabney raised no objection to G&W Warren's trial of the case under this theory of liability. And the parties' respective post-trial briefs concerned only Dabney's potential liability under the Guaranty.

---

[1] The Agreement and related documents, which are attached to the complaint, identify Seller as "Warren's Harley-Davidson, Inc., a Corporation." G&W Warren's alleged in the complaint that it is a California corporation that was formerly known as "Warren's Harley-Davidson, Inc." Wanda Warren testified that when she and her husband sold the dealership, they—at the request of Harley-Davidson—changed the name of the corporation to G&W Warren's, Inc. Any reference herein to the rights and obligations of the Seller under the Agreement and attendant documents shall be to those of G&W Warren's, regardless of the name of the corporation at the time those documents were executed.

After a court trial on September 22, 2014, and submission of the case to receive post-trial briefs, the court issued its tentative decision in favor of G&W Warren's. It found Dabney liable under the Guaranty and rejected Dabney's affirmative defenses. Formal judgment was later entered on January 22, 2015, awarding G&W Warren's damages against Dabney in the amount of $2,746,318.78, plus interest, costs of $1,281, and attorney fees according to proof in a separate proceeding. The monetary judgment was based upon the following components adduced through evidence presented by G&W Warren's accountant: $1,611,691.72 (promissory note), $198,167.20 (lease), $537,399.17 (covenant not to compete), $567,136.34 (consulting agreements), less $168,075.65 (escrow payment from subsequent sale of dealership). Dabney appealed from the judgment. On April 13, 2015, a modified judgment was entered, reflecting the inclusion of an attorney fee award of $23,805 in favor of G&W Warren's. Dabney thereafter filed a notice of appeal from the "order after judgment" identified as having been entered on the date of entry of the modified judgment.[2]

DISCUSSION

I.      *Summary of Relevant Agreements*

In order to effectuate the sale of the motorcycle dealership, the parties entered into the Agreement and various other instruments referenced in the Agreement. (Hereafter, the Agreement and other instruments referenced therein are referred to collectively as the

---

[2] G&W Warren's argues incorrectly that this second appeal notice, filed June 29, 2015, was untimely pursuant to rule 8.104(a)(1)(A) of the California Rules of Court. Although the notice was filed 62 days after service of notice of entry of the modified judgment, it was timely, since the 60th day for filing the notice of appeal fell on a Saturday (June 27, 2015) and the next business day was June 29, 2015. (See Code Civ. Proc., § 12a.) But to the extent Dabney purportedly sought, by his second notice of appeal, to challenge the court's order awarding attorney fees, he has forfeited that challenge by failing to raise the issue in his appellate briefs. (*Kelly v. CB & I Constructors, Inc.* (2009) 179 Cal.App.4th 442, 451 [failure to assert issue in appellate briefs resulted in forfeiture of claim of error].)

4

purchase documents.) Although the precise date of execution of the purchase documents cannot be gleaned from the record, it is apparent that they were signed by the parties in November 2006.

The Agreement provided in the opening paragraph that it was being entered into between G&W Warren's, as Seller, and " 'Dabney' (subject to assignment under section 9.6 hereof to his designated corporation or other entity)," as Buyer. Included among the recitals were that Seller wished to sell, and Buyer wished to buy the motorcycle dealership and that the parties also wished to enter into a lease where the dealership was located.

The Agreement contained specific references to other instruments that were contemplated in the transaction, and the form of each instrument was attached to the Agreement. The remaining agreements signed by the parties consisted of, inter alia, (1) a promissory note in the amount of $1,016,000 signed by Dabney as Maker; (2) a five-year lease of the business premises signed by Dabney as Tenant, with monthly rent fixed at $31,400; (3) a covenant not to compete (noncompete agreement) signed by G&W Warren's, as Seller, the Warrens, as Principals, and Dabney, as Buyer, calling for Dabney to pay the Warrens $8,333.33 per month for a term of five years ($500,000 total); (4) separate consulting agreements signed by Granville and Wanda Warren, as consultants, and Dabney, as Buyer, calling for Dabney to pay the Warrens $4,166.67 per month, each, for a term of five years ($500,000 total); and (5) a Letter of Guaranty signed by Dabney.

## II.    *Liability of Dabney as Principal*

Before addressing Dabney's chief claims of error, we consider the question of Dabney's liability as the principal obligor under the purchase documents. A brief review of this issue is necessitated by the ambiguity created by the allegations of the complaint, as compared with the theory of the case presented by G&W Warren's at trial.

5

Dabney asserts in his opening brief that the case was tried and decided solely upon his alleged liability as surety under the Guaranty. He contends that it was clear that he could not be held liable as a principal because any such liability was terminated by his assignment of the Buyer's rights to Assignee, a proper assignment as contemplated under the terms of the Agreement.

G&W Warren's makes two arguments in its respondent's brief in favor of Dabney's liability as a principal. First, it contends that there was no effective assignment by Dabney to Assignee relieving Dabney of personal liability under the purchase documents. Second, G&W Warren's asserts that by the terms of the noncompete agreement, any assignment by Dabney would not relieve him of personal liability under that agreement. These arguments fail for several reasons.

First, as noted above, although the case was initially pleaded as one for Dabney's liability as a principal under the purchase documents, the case was tried under the theory that he was liable as surety under the Guaranty. This was confirmed on multiple occasions by counsel for G&W Warren's when he (1) stated toward the conclusion of the trial that G&W Warren's was seeking recovery from Dabney under the Guaranty of Assignee's obligations; (2) did not contend at trial that Dabney's assignment of his rights as Buyer to Assignee was ineffective or that the terms of the noncompete agreement precluded Dabney from assigning his rights thereunder to relieve himself of obligations as principal; and (3) limited his argument in his post-trial brief to Dabney's liability under the Guaranty, stating that "[n]otwithstanding the apparent assignment, [Dabney] remained liable to [G&W Warren's] by virtue of a written Letter of Guaranty."

Moreover, contrary to G&W Warren's assertion in its appellate brief, the trial court did not base its decision on Dabney's liability as principal under the purchase documents. Instead, the court noted in its tentative decision that upon sale, the dealership was placed in a corporation formed by Dabney and three others, changing the business name to MMI; as a result of a later economic downturn, MMI defaulted on the required

6

payments; G&W Warren's in the action sought recovery from Dabney under the Guaranty; and that Dabney's defenses under the Guaranty were without merit. G&W Warren's is precluded from now asserting that the judgment should be affirmed based upon Dabney's liability as a principal. (See *Beroiz v. Wahl* (2000) 84 Cal.App.4th 485, 498, fn. 9 [plaintiff cannot assert new theory of liability for the first time on appeal]; *Richmond v. Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 874 [same].)

Second, at no time did G&W Warren's assert below that Dabney's assignment of his rights as Buyer to Assignee was ineffective or that any assignment would not relieve Dabney of obligations as principal under the noncompete agreement. G&W Warren's has therefore forfeited these arguments. (See *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133-1134; *Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184-185, fn. 1.)

Third, the contentions, in any event, lack merit. As to the assignment of the Agreement, G&W Warren's states conclusorily in respondent's brief that Dabney "did not offer evidence of a signed, written assignment, as required." In the introductory paragraph, the Agreement defined "the 'Buyer' " as "Judson V. Dabney, II (subject to assignment under section 9.6 hereof to his designated corporation or other entity)." Section 9.6 provided in relevant part: "**Assignment.** This Agreement shall not be assignable by any Party without the prior written consent of the other Party; provided, however, that Buyer may assign its interests hereunder to any corporation or other entity in which Buyer has a controlling interest whereupon that assignee shall automatically and without need for consent or approval of any other Party . . . become the Buyer, with the assignor Buyer being fully and completely relieved of any obligation or duty hereunder." Contrary to G&W Warren's assertion, there was no requirement under section 9.6 that the contemplated assignment by Dabney be in writing or delivered to the Seller. Further, Wanda Warren testified that she (1) understood that Dabney had assigned his rights under the Agreement to Assignee, MMI; (2) had (along with her husband) signed a bill of sale

7

in which the Buyer was identified as MMI; (3) had accepted payments from MMI; and (4) had no objection to such assignment.

As to the assignability of the noncompete agreement, G&W Warren's argues on appeal that any such assignment would not relieve Dabney of liability as a principal. It cites to section 7 of the noncompete agreement as expressly prohibiting its assignment by the Buyer. Section 7 provided in part: "No party may assign duties and benefits hereunder . . . This Agreement shall be binding upon, and shall inure to the benefit of, the parties to it and their respective heirs, legal representatives, successors, assigns." But G&W Warren's argument ignores the fact that the preamble of the noncompete agreement identified the " 'Buyer' " as "[insert **JUDSON V. DABNEY II** or designated assignee entity]." This description was consistent with the preamble of the Agreement in which, as noted above, the " 'Buyer' " was identified as Dabney, subject to the assignment provisions of section 9.6 of the Agreement. Reading the two agreements together, it is plain that section 7 of the noncompete agreement prohibited only *further assignments* by Buyer after the contemplated assignment by Dabney to an entity he controlled, as specified in the Agreement.

Accordingly, there is no basis for G&W Warren's contention here that Dabney remained liable as principal under the various purchase documents.

*III.    Challenge to Judgment Based on Guaranty Liability*

Dabney asserts two claims of error with respect to the trial court's imposition of liability under the Guaranty. First, he argues that the judgment included liability for three obligations under the purchase and sale transaction that were not subject to the Guaranty, namely, the obligations under the noncompete agreement and the two consulting agreements. Second, he contends that the court erred in imposing any liability at all, because any undertaking he assumed under the Guaranty to satisfy the obligations of the principal (Buyer) was exonerated as a result of the Seller's alteration of the principal's obligations without Dabney's consent. We address these two arguments below.

8

A.     Judgment Exceeded Scope of Guaranty

The second paragraph of the Guaranty provided in relevant part:  "[Dabney] covenant[s] and agree[s] . . . to guarantee, in favor of [the Warrens and W&G Warren's], the collection and receipt of all amounts to be paid under [*sic*] by Buyer under Section 2 of the Agreement, the Maker's obligations under the Promissory Note(s), and the Tenant under the Lease."  Section 2.1 of the Agreement provided that "[t]he consideration to be paid by Buyer for the Purchased Assets is the sum (the 'Purchase Price') of the following: . . ."  Section 2.1 went on to list monetary payments (based upon specific formulae or assigned values) for six categories of assets, namely, (a) new motorcycles; (b) used motorcycles; (c) goodwill, proprietary rights, and other intangible assets ($700,000); (d) fixed assets, equipment, and miscellaneous supplies ($50,000); (e) MotorClothes, parts, accessories, boutique items, merchandise, and miscellaneous inventory ($745,000); and (f) work-in-progress ($21,000).  Section 2 of the Agreement did not identify any other assets or items that comprised the "Purchase Price."

Dabney contends that the Guaranty, by its specific terms, embraced only particular obligations of the principal (Buyer) under the various purchase documents.  He argues that, simply stated, since the noncompete and consulting agreements were not mentioned, the obligations thereunder were not secured by the Guaranty.  G&W Warren's responds that the Guaranty included all obligations under the purchase documents because (1) the goodwill of the business that was referenced in section 2 of the Agreement included amounts that were allocated in the sale to payments under the noncompete and consulting agreements; (2) the Agreement adopted and incorporated by reference all instruments signed in connection with the sale; and (3) the Warrens understood that the payments made by Buyer under the Agreement and accompanying instruments (including the noncompete and consulting agreements) were all part of one purchase price for the dealership.

9

"A surety or guarantor is one who promises to answer for the debt, default, or miscarriage of another . . ." (Civ. Code, § 2787.)[3] A guarantor or "surety cannot be held beyond the express terms of his contract." (*Bloom v. Bender* (1957) 48 Cal.2d 793, 803 (*Bloom*).) But a contract of a surety or guarantor " 'is to be interpreted by the same rules used in construing other types of contracts, with a view towards effectuating the purposes for which the contract was designed. [Citations.]' [Citations.]" (*U.S. Leasing*, *supra*, 69 Cal.2d at p. 284, quoting *Bloom*, at p. 803; see also §§ 1635, 2837.)

Accordingly, in determining the scope of the Guaranty here, we invoke familiar principles for the interpretation of contracts. "The basic goal of contract interpretation is to give effect to the parties' mutual intent at the time of contracting. (Civ. Code, § 1636; [citation].) When a contract is reduced to writing, the parties' intention is determined from the writing alone, if possible. (§ 1639.) 'The words of a contract are to be understood in their ordinary and popular sense.' (Civ. Code, § 1644; [citation].)" (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 955-956 (*Founding Members*).) " 'Contract formation is governed by objective manifestations, not the subjective intent of any individual involved. [Citations.] The test is "what the outward manifestations of consent would lead a reasonable person to believe." [Citation.]' [Citation.]" (*Allen v. Smith* (2002) 94 Cal.App.4th 1270, 1277.) Thus, "[t]he parties' undisclosed intent or understanding is irrelevant to contract interpretation. [Citations.]" (*Founding Members*, at p. 956.)

The Guaranty on its face secured only specified obligations assumed by the Buyer in the purchase and sale transaction. In the instrument, Dabney guaranteed "the

---

[3] Pursuant to a 1937 amendment to Civil Code section 2787, California law makes no distinction between a surety and guarantor. (See *U.S. Leasing Corp. v. duPont* (1968) 69 Cal.2d 275, 284, fn. 10 (*U.S. Leasing*).) Further statutory references are to the Civil Code unless otherwise specified.

collection and receipt of all amounts to be paid" by the Buyer under the "Purchase Price" as defined in section 2 of the Agreement, under the promissory note, and under the lease agreement. As noted, the elements of the "Purchase Price" described in section 2.1 of the Agreement consisted of specific amounts paid for new and used motorcycles, inventory, fixed assets, equipment, supplies, merchandise and accessories, and goodwill, proprietary rights and other intangible assets. In another section of the Agreement (section 3.4), provisions were made for the Buyer to undertake additional obligations over a five-year term by signing four separate instruments—a lease ($1,884,000), noncompete agreement ($500,000), and two consulting agreements ($500,000 in the aggregate). And the parties' apparent intention to identify in the Agreement the obligations under the Purchase Price as being separate and apart from the Buyer's other obligations was demonstrated in section 3.4; there, the Buyer's obligation to furnish the Purchase Price (section 3.4(b)) was listed separately from the obligations to provide the signed lease, noncompete agreement, and consulting agreements (section 3.4(c)-(e)).

Further, the Guaranty is described in the Agreement in one subsection as "[a] personal guaranty *of the promissory note* executed by Judson V. Dabney, II in the form of Exhibit 7 hereto." (Italics added.) And the Agreement identified as one of the conditions precedent to the Buyer's obligations as the execution of a lease agreement in a form attached to the Agreement "and personally guarantied by Judson V. Dabney, II in the form and content of Exhibit 7 hereto." These descriptions of the Guaranty—and the omission in the Agreement of any reference to the Guaranty as securing the Buyer's obligations under the noncompete or consulting agreements—constitute further evidence of the parties' mutual intention, as expressed in the purchase documents, that the Guaranty was limited to specific obligations of the Buyer. Had the parties intended the Guaranty to embrace the obligations of the Buyer under these three agreements, they could have easily so provided. (Cf. *Stephenson v. Drever* (1997) 16 Cal.4th 1167, 1174-1175 [under the maxim *expressio unius est exclusio alterius*, fact that contract expressly

11

provided a consequence to follow from an event "tend[ed] to negate any inference that the parties also intended another consequence to flow from the same event"].)

But G&W Warren's argues that the mutual intentions of the parties and the circumstances under which the purchase documents were executed show that the Guaranty was intended to embrace the obligations under the noncompete agreement and consulting agreements. It adverts to the testimony of Wanda Warren that (1) the parties relied on their respective accountants to structure the transaction to their mutual tax advantage; (2) the Warrens "didn't really retain an attorney," but had an attorney look at the purchase documents after they were prepared by Dabney's attorney; (3) she understood that the consideration to be paid by the Buyer under the consulting agreements was part of the purchase price; and (4) she and her husband thought it would be "prudent" to obtain the Guaranty. G&W Warren's asserts further that Dabney, in his testimony, did not contradict Wanda Warren's testimony concerning her understanding of the transaction.

We note that the language of the contract governs its interpretation when it "is clear and explicit, when it does not involve an absurdity." (§ 1638.) And, generally speaking, the parties' intentions are to be ascertained from the contract's language alone, where possible. (§ 1639.) "Extrinsic evidence is 'admissible to interpret the instrument, but not to give it a meaning to which it is not reasonably susceptible' [citations], and it is the instrument itself that must be given effect." (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865; see also *Pacific Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.* (1968) 69 Cal.2d 33, 37 [extrinsic evidence admissible to explain contract not because contract language is clear on its face but when it "is relevant to prove a meaning to which the language of the instrument is reasonably susceptible"].) Here, the language of the Guaranty "is clear and explicit" (§ 1638) and on its face bears the meaning Dabney ascribes to it, namely, that he, as guarantor, agreed to stand behind the Buyer's obligations under section 2 of the Agreement (i.e., the consideration comprising

12

the "Purchase Price," the promissory note, and the lease). And while one may envision a sale of a business structured differently so that the party issuing a guaranty might agree specifically to stand behind *all* obligations undertaken by the buyer, the language in this instance guaranteeing only certain obligations "does not involve an absurdity." (*Ibid.*)

Further, while G&W Warren's urges—based in part upon Wanda Warren's testimony as to her understanding—that the parties' mutually intended that the Guaranty include the Buyer's obligations under the noncompete and consulting agreements, the objective intent, as shown by the words of the document, rather than the subjective intent of one of the parties, controls. (*Founding Members*, *supra*, 109 Cal.App.4th at p. 956; see also *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1166, fn. 3 ["evidence of the undisclosed subjective intent of the parties is irrelevant to determining the meaning of contractual language"].) Thus, "[c]ontract formation is governed by objective manifestations, not subjective intent of any individual involved. [Citations.] The test is 'what the outward manifestations of consent would lead a reasonable person to believe.' [Citation.]" (*Roth v. Malson* (1998) 67 Cal.App.4th 552, 557.) Thus, the fact that the Warrens may have subjectively intended or believed that the Guaranty would secure all obligations of the Buyer—where that intention or belief was not disclosed to Dabney—is of no consequence in construing the Guaranty.

But G&W Warren's contends that under the plain meaning of the Agreement, the "goodwill" of the business, as referred to in section 2, "includes the compensation allocated to the noncompete and consulting agreements." We acknowledge that, practically speaking, there is a close connection between the transfer of goodwill in the sale of a business and a covenant not to compete obtained from the seller. As has been explained: "[C]ourts may enforce nonsolicitation covenants barring the seller from soliciting *the sold business's* employees and customers. [Citation.] These covenants prevent the seller from unfairly depriving the buyer of the full value of its acquisition, including its goodwill. [Citations.] . . . A covenant not to solicit the sold business's

13

employees and customers prevents the seller from eroding the very goodwill it sold, while allowing the seller otherwise to pursue its chosen business with whatever employees and customers it can attract. [Citation.]" (*Strategix, Ltd. v. Infocrossing West, Inc.* (2006) 142 Cal.App.4th 1068, 1073.) Nothing in either the Agreement or Guaranty, however, suggests that the Buyer's compensation of the Seller under the noncompete agreement was one of the obligations secured under the Guaranty. Thus, there is no support for G&W Warren's bare statement that the goodwill "include[d] the compensation allocated to the noncompete and consulting agreements." To the contrary, there is no reference in section 2.1(c) of the Agreement—in which the Buyer agreed to an allocation of $700,000 of the "Purchase Price" to "goodwill, proprietary rights and other intangible assets"—to payments under the noncompete and consulting agreements that are described elsewhere in the Agreement.

Lastly, we reject G&W Warren's argument that because the Agreement incorporated by reference the remaining purchase documents, "the business had one purchase price, allocated among several contracts," including the noncompete and consulting agreements. As mentioned, the "Purchase Price" was specifically described in section 2 of the Agreement, and that description did *not* include the consideration provided under the noncompete and consulting agreements. To construe that section of the Agreement to include payments made under those agreements would contravene the principle that "[i]f the plain language of the instrument is unambiguous, a court may not 'read into' the document additional terms in order to conform its meaning to what the court's 'intuition' tells it the parties must have intended. Rather, the court 'is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted . . . .' [Citations.]" (*PV Little Italy, LLC v. MetroWork Condominium Assn.* (2012) 210 Cal.App.4th 132, 152, quoting Code Civ. Proc., § 1858.)

14

As noted, a surety (or guarantor) may not be held liable beyond the express terms of his or her contract. (*Bloom*, *supra*, 48 Cal.2d at p. 803; see also *U.S. Leasing*, *supra*, 69 Cal.2d at p. 284; *Bank of America Nat. Trust & Savings Ass'n v. Kelsey* (1935) 6 Cal.App.2d 346, 350 [guarantor's liability "should not be extended by implication beyond the express terms of the instrument in which the guaranty is contained"].) Thus, for instance, it was held that a surety's guarantee of the principals' compliance with a specific statute could not be construed to guarantee the principals' compliance with another statute subsequently enacted by the Legislature. (See *Brock v. Fidelity & Deposit Co. of Md.* (1938) 10 Cal.2d 512, 518; see also *Norton v. Title Guaranty & Surety Co.* (1917) 176 Cal. 212, 215 [surety issuing bond for notary could not be held liable for principal's other conduct in acting as the plaintiff's agent and legal adviser].) Applying the relevant rules of contract interpretation, and reviewing the trial court's construction of the contract de novo (see *ibid.*; see also *Founding Members*, *supra*, 109 Cal.App.4th at p. 955 [where there is no extrinsic evidence or extrinsic evidence is not in conflict, appellate court construes contract de novo]), we conclude that the court erred in construing the Guaranty as constituting Dabney's guarantee of the Buyer's obligations under the noncompete and consulting agreements.

B.     Guaranty Liability Was Not Exonerated

Dabney also contends that any liability he might otherwise have incurred under the Guaranty was exonerated under section 2819, which reads in part: "A surety is exonerated, except so far as he or she may be indemnified by the principal, if by any act of the creditor, without the consent of the surety the original obligation of the principal is altered in any respect, or the remedies or rights of the creditor against the principal, in respect thereto, in any way impaired or suspended." He asserts that the undisputed evidence was that G&W Warren's and Assignee (MMI) entered into agreements among themselves, without Dabney's knowledge or consent, that constituted material alterations of the original obligations of the Buyer under the purchase and sale documents. Dabney

15

cites to evidence adduced at trial that after Assignee had financial difficulties, G&W Warren's entered into two separate deferral agreements with Assignee under which the obligations under the purchase and sale documents (excluding the lease) were deferred for separate periods of six months, from September 2008 to March 2009, and from March 2009 to September 2009. Dabney also cites to evidence that G&W Warren's extended two separate loans to Assignee in September 2007 and February 2010.

G&W Warren's responds that Dabney's exoneration defense is without merit for three principal reasons. First, the evidence showed that Dabney consented to the deferral agreements. Second, G&W Warren's argues that Dabney expressly waived the defense under the terms of the Guaranty. Third, G&W Warren's argues that, in any event, the obligation deferrals were not material changes that justified application of the exoneration defense.

### 1. Consent

Wanda Warren testified that after the business sold, she learned that Dabney had an arrangement with three other "partners"—Roger Gilbert, Kyle Dalton, and Lester Veik—to operate the dealership under the name "Monterey Motorcycles, Inc." Dabney testified that he incorporated MMI in January 2007, with himself as the managing shareholder holding a controlling interest in the company. Gilbert and Dalton were the on-site managers of the dealership. Payments were made by MMI to G&W Warren's or to the Warrens under the promissory note, lease, noncompete agreement, and consulting agreements. Wanda Warrens testified that in September 2008, MMI defaulted on the obligations, and, upon the request of Gilbert and Dalton, she and her husband granted MMI a six-month deferral of payments under the promissory note, noncompete agreement, and consulting agreements. The Warrens thereafter, in March 2009, granted MMI a second six-month deferral of those payments. Both deferrals were reduced to writing. Wanda Warrens also testified that she and her husband made additional loans to

16

MMI of $375,000 in September 2007 and of $250,000 in February 2010.  The loans were negotiated with Gilbert and Dalton, and each was evidenced by a promissory note.[4]

Dabney testified that he was not consulted about any modifications to the promissory note.  When asked by counsel for G&W Warren's if he had any "notice of these extension agreements at the time they were entered into," Dabney responded, "I don't recall."[5]

In its tentative decision, the trial court rejected Dabney's exoneration defense, holding that he had consented to the deferral agreements.  It found that Dabney knew of the deferral agreements.  It reasoned that Dabney was the controlling and managing shareholder of MMI, and that he "did not deny that he had knowledge of the requested deferments, but only that he could not recall if he had such knowledge.  The court finds this claim unpersuasive.  It strains credulity that one in [Dabney's] position, as an experienced businessman, holding the major interest in the corporation supported by his personal guarantee [*sic*], would not be actively involved in efforts to fend off corporate failure and personal liability."

The determination of this issue—whether Dabney had knowledge of the deferral agreements—is a question of fact.  (See *Shapiro v. Sutherland* (1998) 64 Cal.App.4th 1534, 1544 [seller's actual knowledge of undisclosed fact is question of fact]; *Hart v. National Mortgage & Land Co.* (1987) 189 Cal.App.3d 1420, 1426 [employer's knowledge of supervisor's harassment and failure to act was question of fact].)  We

---

[4] It is clear, as Wanda Warren admitted in her testimony, that G&W Warren's was not seeking recovery in this action under these promissory notes executed by MMI.

[5] In response to the question of whether the first extension agreement made it more difficult for MMI to meet its obligations, Dabney responded:  "Well . . . what I'm saying is I didn't know that these were being extended.  And I didn't have a chance to discuss or consult with the people who made the decisions about whether to do that or not . . .  So I don't really know how to respond to that other than I didn't know of these extensions at all."

review the court's factual determination by applying "the familiar substantial evidence test, [under which we] view the evidence in the light most favorable to the court's judgment, giving it the benefit of every reasonable inference and resolving all conflicts in its favor." (*In re R.V.* (2015) 61 Cal.4th 181, 217.) Under this standard, we conclude that there was substantial evidence supporting the court's finding that Dabney knew about the deferral agreements. The fact that Dabney argues that the evidence supports his position that he had no such knowledge is of no consequence here, where that position was based upon his own testimony, which the trial court did not credit. "We defer to the trial court's determination of credibility and do not reweigh evidence or reassess the credibility of witnesses. [Citation.]" (*Behm v. Clear View Technologies* (2015) 241 Cal.App.4th 1, 15 (*Behm*).)

Dabney argues further in passing—in two partial sentences—that his obligations under the Guaranty were exonerated by the two loans made to Assignee.[6] We decline to address this conclusory argument. (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 (*Benach*) ["conclusory presentation, without pertinent argument or an attempt to apply the law to the circumstances of this case, is inadequate" and deemed forfeited].) Moreover, the argument lacks merit even were we to consider it. There was brief evidence, submitted through the testimony of Dabney, that he did not know about the two loans until after they had occurred. And although the trial court did not specifically mention the loans in its tentative decision, under the doctrine of implied findings, we must presume that the court resolved this factual question in favor of the

---

[6] In the concluding paragraph of the section of the opening brief concerning exoneration, Dabney stated: "With section 2819 being applicable, and not being waived, the modifications at issues [*sic*] are (1) . . .; and (2) the extension of the additional Loans, effectively expanding the debt service of the obligor to the Warrens." In the Conclusion section of that brief, Dabney stated: "Moreover, the also [*sic*] erred in failing to find Dabney exonerated under Civil Code section 2914 by reason of the . . . Loans made without his consent as surety."

respondent, G&W Warren's, if supported by substantial evidence. (See *Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 58-59.) It may be readily inferred—based upon the trial court's conclusion regarding Dabney's credibility concerning his claimed lack of knowledge of the two deferral agreements—that the court similarly rejected his testimony that he did not know about the two loans to Assignee, the entity in which he was the managing shareholder and held a controlling interest. We defer to the trial court on questions of witness credibility. (*Behm*, *supra*, 241 Cal.App.4th at p. 15.) Moreover, so long as the court's determination was not arbitrary—which, here, it was not—it was free to reject Dabney's testimony, regardless of whether there was any evidence contradicting it. (*Hicks v. Reis* (1943) 21 Cal.2d 654, 659-660 [trier of fact, so long as it does not act arbitrarily, may reject in toto testimony of a witness, even if that testimony is uncontradicted].)

Because the trial court's conclusion that Dabney had knowledge of the two deferral agreements and two loans to Assignee was supported by substantial evidence, Dabney's challenge that his obligations under the Guaranty were exonerated under section 2819 fails.

### 2. *Waiver*

The trial court rejected the exoneration defense on the further ground that, by the terms of the Guaranty, Dabney had expressly waived that defense. Assuming arguendo that the court erred in concluding that Dabney had knowledge of the deferral agreements and the loans to Assignee, the court's finding that Dabney expressly waived the exoneration defense was a proper alternative basis for rejecting Dabney's defense under section 2819.

A surety (or guarantor) may, prior to the impairment, alteration, or suspension of the principal's obligation, waive the protections afforded him or her under section 2819. "[I]f effective consent to the change in the obligation of the principal will prevent the otherwise resultant discharge of the surety [under section 2819], such consent may be

19

given in advance of the alteration of the principal's obligation as well as at or after the time of such act. [Citations.]" (*Bloom*, *supra*, 48 Cal.2d at p. 801.) And the ability of a surety or guarantor to waive specific defenses otherwise available to him or her, including exoneration under section 2819, is expressly provided for in section 2856.[7] Further, such a waiver, to be effective, need not include particular language, and need not refer specifically to a statutory provision. (§ 2856, subd. (b).)

Thus, in one instance, the court held that a guarantor's exoneration defense was precluded by language in the guaranty that the guarantor's "liability 'shall be coextensive with that of the taxpayer [principal] and no change in the law or extensions, waivers, or modifications in the liability negotiated between the taxpayer and the State Board of Equalization shall in any way relieve [guarantor] of his obligation herein.' " (*State Bd. of Equalization v. Carleton* (1990) 223 Cal.App.3d 1607, 1610, italics omitted (*Carleton*).) Citing *Bloom*, *supra*, 48 Cal.2d at p. 801, the appellate court concluded "that this provision constitutes an unconditional promise to pay the liabilities of the taxpayer even if the principal obligation is materially altered without the knowledge or express consent of the surety." (*Carleton*, at p. 1610.)

The last paragraph of the Guaranty provided: "[Dabney] further agrees that [the] Letter of Guaranty shall remain in full force and effect notwithstanding and shall also secure amounts owing under any modifications to the payment terms or amounts outstanding under the Promissory Note and the Lease so long as those modifications are consented to in writing by the Borrower or Tenant as the case may be." On its face, this provision constituted Dabney's advance consent to be bound under the Guaranty in the

---

[7] Section 2856, subdivision (a)(1) provides in part: "Any guarantor or other surety, including a guarantor of a note or other obligation secured by real property or an estate for years, may waive any or all of the following: [¶] (1) The guarantor or other surety's rights of subrogation, reimbursement, indemnification, and contribution and any other rights and defenses that are or may become available to the guarantor or other surety by reason of Sections 2787 to 2855, inclusive."

20

event there was any modification of the terms of payment under the Promissory Note, so long as the modification was signed by the Borrower. There seems no question that the provision applies to the written deferral agreements signed by the Warrens and Assignee here.

Dabney nonetheless contends in his opening brief that he did not waive the exoneration defense. He asserts that the last paragraph of the Guaranty did not contain the words "waive" or "waiver," and there was no other evidence that he voluntarily relinquished the right to assert the statutory defense under section 2819. But this position ignores the fact that under section 2856, subdivision (b), no particular words or references to statutory provisions are required to effect a guarantor's waiver of defenses. The language contained in the last paragraph of the Guaranty here was sufficiently clear to constitute Dabney's advance consent to (or waiver of) the modification of payment terms by G&W Warren's and Assignee. (See *Bloom*, *supra*, 48 Cal.2d at p. 801; *Carleton*, *supra*, 223 Cal.App.3d at p. 1610.)

Accordingly, we conclude that there was substantial evidence supporting the trial court's finding that Dabney consented to the deferral agreements and the two loans to Assignee (MMI), and that in any event, by the terms of the Guaranty, Dabney expressly waived the exoneration defense. It is therefore unnecessary to address G&W Warren's contention that the obligation deferrals were not material changes to the Agreement that supported the defense of exoneration. (*Benach*, *supra*, 149 Cal.App.4th at p. 845, fn. 5 [appellate courts will not address issues whose resolution is unnecessary to disposition of appeal].)

## DISPOSITION

The judgment is reversed. The trial court is directed to vacate the judgment and enter a new judgment in favor of plaintiff G&W Warren's against defendant Dabney in the amount of $1,641,783.27, plus interest, costs, and attorney fees. Each party shall bear its/his own statutory costs on appeal.

21

_____
               RUSHING, P.J.

WE CONCUR:

_____
     PREMO, J.

_____
     ELIA, J.

*G & W Warren's, Inc. v. Dabney*
**H042243**

Trial Court:                                          Monterey County Superior Court
                                                     Superior Court No.: M122308

Trial Judges:                                        The Honorable Thomas W. Wills
                                                     The Honorable Robert A. O'Farrell


Attorneys for Plaintiff and Respondent              STRONG APPELLATE LAW
G & W Warren's, Inc.:                                Jeanine G. Strong

                                                     DOUGHERTY & GUENTHER, APC
                                                     Ralph P. Guenther


Attorneys for Defendant and Appellant               ARENT FOX LLP
Judson V. Dabney, II:                                Halbert B. Rasmussen

*G & W Warren's, Inc. v. Dabney*
**H042243**